ORAL ARGUMENT NOT YET SCHEDULED

# In The United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 16-1170 (consolidated with No. 16-1219)

NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and THE UNITED STATES OF AMERICA,

*Respondents*.

On Petitions for Review of an Order
of the Federal Communications Commission

## BRIEF OF PETITIONER

*James Bradford Ramsay*
GENERAL COUNSEL
*Jennifer Murphy*
ASSISTANT GENERAL COUNSEL
NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS (NARUC)
1101 VERMONT AVE., NW, SUITE 200
WASHINGTON, DC 20005
(202) 898-2207

**Counsel for NARUC**

**January 30, 2017**

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), petitioner the National Association of Regulatory Utility Commissioners certifies as follows:

### I. PARTIES:

#### A. PARTICIPANTS BEFORE THE AGENCY:

The Order on review atypically did not include a list of companies and organizations that participated in the proceedings below. Undersigned counsel used his best efforts to create a list of who filed comments below utilizing the FCC's newly updated Electronic Comment Filing System. I collected names from comments filed from the beginning of the comment cycle on the 2015 further proposed rulemaking that lead to the *Order* on review to a week before the day the *Order* was approved by the FCC Commissioners – I bolded the Petitioners (and intervenor) in the current consolidated appeals that participated below:

AARP
Absentee Shanee Tribe of Indians of Oklahoma
Access Humboldt
Adriana Solar
ADTRAN
AEI's Center for Internet, Communications, and Technology Policy
AFL-CIO
Alaska Communications
Alaska Rural Coalition
Alaska Telephone Association
Alexicon Telecommunications Consulting
Alliance for Excellent Education
Amanda Cullen

American Broadband & Telecommunications Company
American Cable Association
American Council of the Blind
American Library Association
American Telemedicine Association
AmeriHealth Caritas
America's Health Insurance Plans
Amy Machael
Asian Americans Advancing Justice
Assist Wireless, LLC and Easy Telephone Services Company d/b/a Easy Wireless
Association for Community Affiliated Plans
Atlantic Tele-Network, Inc.
AT&T Services, Inc.
Axiom Technologies
Benton Foundation
Black Women's Roundtable
Blair Levin
Blue Jay Wireless, LLC
Boomerang Wireless, LLC
Budget PrePay, Inc.
Burke's Garden Telephone Company, Inc.
California Commission on Access to Justice
California Department of Education
California Emerging Technologies Fund
California Public Utilities Commission
California Telehealth Network
Carolyn A. Cook
Carrie Murphy
Castleberry Telephone Company, Inc.
Centene Corporation
Center for Media Justice
Center for Rural Strategies
Center on Budget and Policy Priorities
CenturyLink
Charter Communications
Cherokee Nation
Choctaw Nation of Oklahoma
Choice Communications, LLC
Cigna Corporation
Cincinnati Bell Telephone Company, LLC.

City of Boston, Massachusetts, Dept. of Innovation & Technology
City of El Paso, Texas
City of Redmond, Oregon
City of Seattle
Citizens Mutual Telephone Cooperative
Citizens Telephone Corporation
Cordova Telephone Cooperative, Inc.
Commissioners Sandoval (CA PUC), Kane (DC PSC) & NARUC
Coeur d'Alene Tribe
Comcast Corporation
Commissioner Rhoades (NE PSC) & NARUC
Common Sense Media
Commnet Wireless, LLC
Common Cause
Common Sense Kids Action
Communications Workers of America
Community Technology Advisory Board, City of Seattle
Competitive Carriers Association
Computer and Communications Industry Association
Confederated Tribes of the Colville Reservation
Connected Nation
Connect Your Community 2.0
Consortium for School Networking
Consumer Action
Consumer Advisory Committee, FCC FACA
Coquille Indian Tribe
Cox Communications, Inc.
Council of Chief State School Officers
CTIA-The Wireless Association
County of Los Angeles Public Library
Dan Stoneman, San Diego Unified School District Disability Advocates
David A. Super, Georgetown University Law Center
Donald Scheu
Dynamic Spectrum Alliance
Easy Telephone Services Company d/b/a Easy Wireless Education & Libraries Networks Coalition
Ellington Telephone Company
EveryoneOn
Florida Public Service Commission
Fractured Atlas

Free Press
Frontier Communications
General Communication, Inc.
Gila River Telecommunications, Inc.
Glenwood Network Services, Inc.
Glenwood Telephone Membership Corporation
Greenlining Institute
Greg Baca
GVNW Consulting, Inc.
Harry Cohen
Helene M. Keeley
I am Color of Change; et al
INCOMPAS(formerly COMPTEL)
Indiana Utility Regulatory Commission
Information Technology and Innovation Foundation
Internet Innovation Alliance
ITTA - The Voice of Mid-Size Communications Companies
i-wireless LLC
Jay King
Jaime Mariona
John Mayo
John Staurulakis, Inc.
Joint Commenters (Blue Jay Wireless, LLC, i-wireless LLC, Telrite Corporation, and American Broadband & Telecommunications Company, Assist Wireless, LLC, Easy Telephone Services Company d/b/a Easy Wireless, Prepaid Wireless Group LLC, TAG Mobile, LLC, Telscape Communications, Inc./Sage Telecom Communications, LLC (d/b/a TruConnect) and Total Call Mobile, Inc.)
Karen S. Rheuban MD, UVA Health System
Krystle Brandt, Boulder Housing Partners, CO
Landri Taylor
Layton Olson and Illinois Digital Futures Partnership
Leadership Conference on Civil and Human Rights
Leech Lake Telecommunications Company
Lenny Schad, Houston Independent School District
Lifeline Coalition (National Consumer Law Center, Communications Workers of America; The Raben Group; American Library Association; Public Knowledge; United Church of Christ, OC Inc.; National Hispanic Media Coalition; Center for Rural Strategies, Benton Foundation and Center for Media Justice)

Lifeline Connects Coalition (i-wireless LLC, Telrite Corporation, Blue Jay Wireless, LLC and American Broadband & Telecommunications Company)
Low Income Consumer Groups
Magellan Health
Massachusetts Department of Telecommunications and Cable
MAXIMUS, Inc.
McGuire Woods Consulting
Media Action Grassroots Network
Mercy Housing and Mercy Loan Fund
Michigan Public Service Commission
Microsoft
Midcontinent Communications
Missouri Public Service Commission
Mobile Beacon
Mobile Citizen
Molina Healthcare Inc.
Montana Telecommunications Association
Multicultural Media, Telecom and Internet Council
NAACP
National Association of American Veterans
National Association of Federally Impacted Schools
National Association of Neighborhoods
***National Association of Regulatory Utility Commissioners***

***97 NARUC member Commissioners that separately signed a joint advocacy letter submitted by NARUC:***

*Travis Kavulla, NARUC President* - Commissioner, Montana Public Service Commission

*Robert F. Powelson, NARUC 1st Vice President* - Commissioner, Pennsylvania Public Utility Commission

***John W. Betkoski, III, NARUC 2nd Vice President* - Vice Chair, Connecticut Public Utilities Regulatory Authority**

*Lisa Polak Edgar, Immediate Past NARUC President & NARUC Executive Committee* - Commissioner, Florida Public Service Commission

*David Ziegner, NARUC Executive Committee & Treasurer* - Commissioner, Indiana Utility Regulatory Commission

*Ellen Nowak, NARUC Executive Committee* - Chairperson, Public Service Commission of Wisconsin

*Chris Nelson, Chairman, NARUC Committee on Communications & FCC Federal State Joint Board on Universal Service* -Chairman, South Dakota Public Utilities Commission

*Paul Kjellander, Co-Vice Chair, NARUC Committee on Communications & FCC Federal State Joint Conference on Advanced Services* - Commissioner, Idaho Public Utilities Commission

*Catherine J. K. Sandoval, Co-Vice Chair, NARUC Committee on Communications & Federal State Joint Conference on Advanced Services* - Commissioner, California Public Utilities Commission

*Carolene Mays-Medley, Chair, NARUC Committee on Critical Infrastructure* - Commissioner, Indiana Utility Regulatory Commission

***Brandon Presley, Chairman, NARUC Committee on Consumer Affairs* Chairman, Mississippi Public Service Commission**

*Stephen Michael Bloom, FCC Federal State Joint Board on Universal Service* - Commissioner, Oregon Public Utility Commission

*Ronald A. Brisé, Chairman, NARUC Telecommunications Act Modernization Act (TeAM) Task Force, USAC Board of Directors & FCC Federal State Joint Board on Universal* Service - Commissioner, Florida Public Service Commission

*Michael Caron, Member, NARUC TeAM Task Force* -Commissioner, Connecticut Public Utilities Regulatory Authority

*Upendra Chivukula, Member, FCC Communications Security, Reliability and Interoperability Council & NARUC TeAM Task Force* - Commissioner, New Jersey Board of Public Utilities

*Johann A. Clendenin, NARUC TeAM Task Force* - Chairman, Virgin Islands Public Service Commission

*Valerie Espinoza, NARUC TeAM Task Force* - Commissioner, New Mexico Public Regulation Commission

***Sarah Hofmann, State Chair, FCC Federal State Joint Board on Separations* Board Member, Vermont Public Service Board**

*Philip B. Jones, Former NARUC President & FCC Task Force on Optimal PSAP Architecture* - Commissioner, Washington Utilities and Transportation Commission

*Betty Ann Kane, Chair, FCC North American Numbering Council & FCC Federal State Joint Conference on Advanced Services* - Chairman, Public Service Commission of the District of Columbia

*William P. "Bill" Kenney, Chair of the Missouri Universal Service Fund* Commissioner, Missouri Public Service Commission

*Doug Little, Member, NARUC TeAM Act Task Force* - Chairman, Arizona Corporation Commission

*Phil Montgomery, NARUC TeAM Task Force* - Commissioner, Public Service Commission of Wisconsin

*Karen Charles Peterson, NARUC TeAM Task Force* - Commissioner, Massachusetts Department of Telecommunications and Cable
*Crystal Rhoades, Member, FCC North American Numbering Council* - Commissioner, Nebraska Public Service Commission
*Gregg C. Sayre, State Chair, FCC Federal State Joint Conference on Advanced Services* - Commissioner, New York State Public Service Commission
*Tim Schram, FCC Telecommunications Relay Services Advisory Council* Chairman, Nebraska Public Service Commission
*Lynn Slaby, FCC Federal State Joint Conference on Advanced Services* Commissioner, Public Utilities Commission of Ohio
*Pamela Witmer, Member, FCC Communications Security, Reliability and Interoperability Council* - Commissioner, Pennsylvania Public Utility Commission
*Patricia L. Acampora* - Chair, New York State Public Service Commission
*Susan Ackerman* - Chair, Oregon Public Utilities Commission
*Eric Anderson* - Commissioner, Idaho Public Utilities Commission
*Bob Anthony* - Chairman, Oklahoma Corporation Commission
*Kara Brighton* - Commissioner, Wyoming Public Service Commission
***Cecil Brown* - Commissioner, Mississippi Public Service Commission**
*Gladys M. Brown* - Chairman, Pennsylvania Public Utility Commission
*Julie I. Brown*- Chair, Florida Public Service Commission
*Bob Burns*- Commissioner, Arizona Corporation Commission
*Alaina Burtenshaw*- Commissioner, Public Utilities Commission of Nevada
***Margaret Cheney* - Board Member, Vermont Public Service Board**
*Randy Christmann*- Commissioner, North Dakota Public Services Commission
*David Clark* - Commissioner, State of Utah Public Service Commission
*Maida J. Coleman* - Commissioner, Missouri Public Service Commission
*John F. Coleman, Jr.* - Commissioner, Pennsylvania Public Utility Commission
*David W. Danner* - Chairman, Washington Utilities and Transportation Commission
*Lamar B. Davis* -Commissioner, Arkansas Public Service Commission
*Chuck Eaton*- Chairman, Georgia Public Service Commission
*Tim G. Echols* - Commissioner, Georgia Public Service Commission
*H. Doug Everett* - Commissioner, Georgia Public Service Commission

*Joanne Doddy Fort* - Commissioner, Public Service Commission of the District of Columbia
*Kristie Fiegen* - Vice Chairman, South Dakota Public Utilities Commission
*Mike Florio* - Commissioner, California Public Utilities Commission
*Daniel Y. Hall*-Chairman, Missouri Public Service Commission
*Gary Hanson* - Commissioner, South Dakota Public Utilities Commission
*Asim Haque* - Commissioner, Public Utilities Commission of Ohio *Beverly Jones Heydinger* - Chair, Minnesota Public Utilities Commission
*Todd Hiett* - Commissioner, Oklahoma Corporation Commission
*Martin P. Honigberg* - Chairman, New Hampshire Public Utilities Commission
*Arthur House* - Chairman, Connecticut Public Utilities Regulatory Authority
*Mike Huebsch* - Commissioner, Public Service Commission of Wisconsin
*W. Kevin Hughes* - Chairman, Maryland Public Service Commission
*James Huston* - Commissioner, Indiana Utility Regulatory Commission
*Elizabeth "Libby" S. Jacobs*-Board Member, Iowa Utilities Board
*Brad Johnson* - Chairman, Montana Public Service Commission
*Rod Johnson* - Commissioner, Nebraska Public Service Commission
*Sandy Jones* - Commissioner, New Mexico Public Regulation Commission
*Brian P. Kalk* - Commissioner, North Dakota Public Service Commission
*Bob Lake* - Commissioner, Montana Public Service Commission
*Frank E. Landis, Jr.* - Commissioner, Nebraska Public Service Commission
*Thad LeVar* - Chair, State of Utah Public Service Commission
*Lynda Lovejoy* - Commissioner, New Mexico Public Regulation Commission
*Patrick H. Lyons* - Commissioner, New Mexico Public Regulation Commission
*Lauren "Bubba" McDonald, Jr.* - Vice Chairman, Georgia Public Service Commission
*Alan B. Minier* - Chairman, Wyoming Public Service Commission
*Karen L. Montoya* - Commissioner, New Mexico Public Regulation Commission
*Richard S. Mroz* - President, New Jersey Board of Public Utilities
*Dana Murphy* - Vice Chairman, Oklahoma Corporation Commission
*David Noble* - Commissioner, Public Utilities Commission of Nevada
*Carla Peterman* - Commissioner, California Public Utilities Commission
*Willie L. Phillips* - Commissioner, Public Service Commission of the District of Columbia
*Andrew G. Place* - Vice Chairman, Pennsylvania Public Utility Commission
*Kristine Raper* - Commissioner, Idaho Public Utilities Commission

*Ann Rendahl* - Commissioner, Washington Utilities and Transportation Commission
*Paul J. Roberti* - Commissioner, Rhode Island Public Utilities Commission
*Bill Russell* - Deputy Chairman, Wyoming Public Service Commission
*John Savage*- Commissioner, Oregon Public Utilities Commission
*Carol A. Stephen* - Chair, Indiana Utility Regulatory Commission
*Sally A. Talberg* - Commissioner, Michigan Public Service Commission
*Ted J. Thomas* - Chairman, Arkansas Public Service Commission
*Paul Thomsen* - Chairman, Public Utilities Commission of Nevada
*M. Beth Trombold* - Commissioner, Public Utilities Commission of Ohio
*John Tuma* - Commissioner, Minnesota Public Service Commission
*Gerald L. Vap* - Commissioner, Nebraska Public Service Commission
***James Volz* - Chairman, Vermont Public Service Board**
*Audrey Zibelman* - Chair, New York State Public Service Commission
*Jordan A. White* - Commissioner, State of Utah Public Service Commission

**National Association of State Consumer Advocates**
National Association of Telecommunications Officers and Advisors
National Association of the Deaf
National Cable & Telecommunications Association
National Congress of American Indians
National Consumer Law Center
National Consumers League
National Digital Inclusion Alliance
National EBS Association and Catholic Technology Network
National Grange
National Health IT Collaborative for the Underserved, Inc.
National Health IT Collaborative for the Underserved
National Hispanic Media Coalition
National Housing Conference
National Tribal Telecommunications Association
Native Nations Broadband Task Force
Navajo Nation Telecommunications Regulatory Commission
Navajo Tribal Utility Authority
Nebraska Public Service Commission
New America's Open Technology Institute
New Networks Institute
New York City, Office of the Counsel to the Mayor
New York State Public Service Commission
Nez Perce Tribe
NTCA – The Rural Broadband Association

NTUA Wireless, LLC
Radio Bilingue, Inc.
Ralph B. Everett
Red Lake Band of Chippewa Indians
OASIS Institute.
OCA - Asian Pacific American Advocates
Odin Mobile Oklahoma Corporation Commission Olga Ukhaneva
Oglala Sioux Tribe Utility Commission
Oklahoma Corporation Commission
Olga Ukhaneva
Peace Valley Telephone Co., Inc.
Pennsylvania Public Utility Commission
Prepaid Wireless Retail, LLC
Public Interest & Civil Rights Groups
Public Knowledge Qualcomm
Public Utility Commission of Texas
Public Service Commission of Wisconsin
Q-Link Wireless LLC
Qualcomm Incorporated
Riviera Telephone Company, Inc
Rural Broadband Policy Group
Rural Representatives
Sage Telecom Communications, LLC
Schools, Health, and Libraries Broadband Coalition
Scott Wallsten
Senior Service America, Inc.
Small Carriers Coalition
Smith Bagley, Inc.
Smithville Telephone Company
Snagajob
Social Interest Solutions
South Dakota Telecommunications Association
SpotOn Networks LLC
Sprint Corporation
Standing Rock Sioux Tribe
State of Illinois
State Members of the Federal State Joint Conference on Advanced Services
State of Illinois, Dept. of Central Management Services
State Officials

*Adrian Madaro, Massachusetts State Representative*

*Alan Olsen, Oregon State Senator*
*Alexis H. Simpson, NH State Representative*
*Alissa Keny-Guyer, Oregon State Representative*
*Amy Foster, Vice Chair, St. Petersburg City*
*Anita Wood, Councilwoman, City of North Las Vegas Council*
*Armando Martinez, Texas State Representative*
*Arnie Roblan, Oregon State Senator*
*Baltimore City Council members*
*Barbara Robinson, Maryland House of Delegates*
*Benton County Board of Commissioners*
*Biff Traber, Corvallis, Oregon Mayor*
*Bill Hall, Lincoln County, Oregon Commissioner*
*Bill Henry, Baltimore City Councilman*
*Brian Banks, Michigan State Representative*
*Brian Boquist, Oregon State Senator*
*Bukt Rozic, NY State Assemblywoman*
*Carrie Solages, Nassau County Legislature, NY*
*Charles Lavine, State of New York Assembly*
*Chester Noreikis, Oregon City Counselor*
*Chris Gorsek, Oregon State Representative*
*Cindy Rosenwald, NH State Representative*
*Claire Syrett, City Councilor Eugene Oregon*
*Carolyn Howard, Maryland House of Delegates*
*Danielle Glaros, Councilwoman, Prince George's County, MD*
*Daniel Squadron, New York State Senator*
*Daniel Sullivan, New Hampshire State Representative*
*Dave Woodward, Oakland County Commissioner*
*Debra Martin, Crane County, Texas Commissioner*
*Delaine Eastin, California Superintendent of Public Instruction*
*Delores Kelley, Maryland Senate*
*Denise Provost, MA State Representative*
*Denise Simmons, Cambridge City Council*
*Derrick Quinney, Ingham County register of Deeds*
*Dina Neal, Nevada State Assemblyman*
*Drew Herzig, Astoria City, Oregon Councilor*
*Eddie Lucio III, Texas State Representative*
*Edgar Flores, State of Nevada Assemblyman*
*Edwin Lee, Mayor, San Francisco*
*Frank Reddick, Chairman, City of Tampa Council*
*Freddie Taylor, City Council Member, Sulpher Springs*

*Garland E. Pierce, N.C. Legislator, Chair of NC Legislative Black Caucus*
*Helen Giddings, Texas State Representative*
*Henry Twiggs, Springfield City Council, MA*
*Jass Stewart, Brockton City Council*
*Jay Livingstone, Massachusetts State Representative*
*Jeff Woodburn, NH State Senator*
*Jenni Tan West Linn City Councilor*
*Joanne Benson, Maryland Senate*
*Joel Hirsch, Corvallis City Councilor*
*John Huffman, Oregon Legislature*
*John Stromberg, Ashland, Oregon Mayor*
*Joseline Pena-Melnyk Maryland Delegate*
*Jose Tosado, Massachusetts State Representative*
*Joyce Woodhouse, Senator, Nevada*
*Kitty Piercy, Mayor Eugene Oregon*
*Kelly Allen Gray, Councilman, Ft. Worth, TX*
*Kevin Parker, State Senator, New York*
*Latha Mangipudi, New Hampshire House of Representatives*
*Leland Cheung, Cambridge City Councilman*
*Leslie Love, Michigan State Representative*
*Linda Capps, Vice Chair, Citizen Potawatomi Nation*
*Linda Hudson, Mayor City of Fort Pierce, FL*
*Luke Swarthout, Several Public Libraries*
*Maggie McIntosh, Maryland Delegate*
*Maria Del Carmen Arroyo, New York City Council*
*Marisa Marquez, Texas State Representative*
*Margaret Chin, NYC Council Member*
*Marjorie Decker, Massachusetts State Representative*
*Mary Jane Wallner, New Hampshire House of Representatives*
*Mary Pat Clarke, Baltimore City Councilwoman*
*Melvin Edwards, Springfield City Council, MA*
*Members of Oregon Legislature*
*Michael Kearns, State of New York Assembly*
*Michael Vaughn, Maryland House of Delegates*
*Mo Denis, Senator, Nevada State Senate*
*Morris W. Hood III, Michigan State Senator*
*Pamela Goynes-Brown, Mayor Pro Tempore, City of North Las Vegas*
*Phil Barnhart, Oregon State Representative*
*Phillip G. Steck, Member of New York State Assembly*
*Rafael Anchia, Texas State Representative*

*Patricia Fahy, State of New York Assembly*
*Patricia Spearman, State Senator, Nevada*
*Rebekah Gee, MD, Medicaid*
*Reginald Sessions, Commissioner City of Fort Pierce, FL*
*Roland Gutierrez, Texas State Representative*
*Ronnie Peterson, District 6 Washtenaw County*
*Ron Reynolds, Texas State Representative*
*Rory Lancman, New York City Council*
*Sam Singh, Michigan State Representative*
*Sean Garballey, Massachusetts House Of Representatives*
*Sharon Nordgren, New Hampshire State House*
*Sherry Gay-Dagnogo, Representative, Michigan House of Representatives*
*Stephanie Chang, Michigan State Representative*
*Stephen Shurtleff, New Hampshire House of Representatives*
*Susan Bayro, The Osage Nation*
*Thomas Frank West Linn City Councilor*
*Thomas A. Masters, Mayor, City of Riviera Beach, FL*
*Umatilla County Board of Commissioners*
*Vanessa Guerra, Michigan State Representative*
*Vincent Gregory, Michigan State Senator*
*Yvonne Yolie Capin, Councilman, City of Tampa*, FL

Solix, Inc.
Susanville Indian Rancheria
TCA, Inc.
TechFreedom
TelAlaska Telecommunications Industry Association Telecommunications Regulatory Board of Puerto Rico Telscape Communications, Inc
Telrite Corporation dba Life Wireless
The Arc
The Food and Nutrition Service, USDA
The Free State Foundation
The Leadership Conference on Civil and Human Rights
The Raben Group
Time Warner Cable Inc.
Total Call Mobile; et al
Tracfone Wireless, Inc.
Troy Abraham
TruConnect
True Wireless, LLC and TerraCom, Inc.
U.S. Department of Housing and Urban Development

United Church of Christ, OC, Inc.
United States Telecom Association
Univision Communications Inc.
Urban League of Greater Atlanta
Urban Libraries Council
Verizon
Veterans Organizations and Supporters
Voxiva, Inc.
Washington State Access to Justice Board
Waxman Strategies
Windstream
Wireless ETC Petitioners
WTA – Advocates for Rural Broadband

**B. PETITIONER IN THIS APPEAL [16-1170]:**

National Association of Regulatory Utility Commissioners

**PETITIONERS IN SUBSEQUENT JOINT APPEAL[16-1219]:**

Connecticut Public Utilities Regulatory Authority
Mississippi Public Service Commission
Vermont Public Service Board
State of Arkansas
State of Idaho
State of Indiana
State of Michigan
State of Montana
State of Nebraska
State of South Dakota
State of Utah
State of Wisconsin

**C. RESPONDENTS IN CONSOLIDATED APPEALS:**

Federal Communications Commission and The United States of America

**D. INTERVENORS IN THIS APPEAL:**

National Association of State Consumer Advocates

## II. RULING UNDER REVIEW:

The ruling under review (*Order*) is the Federal Communications Commission's *Third Report and Order, Further Report and Order, and Order on Reconsideration* released April 27, 2016, in the proceeding captioned: *In the Matter(s) of Lifeline and Link Up Reform and Modernization; Telecommunications Carriers Eligible for Universal Service Support, Connect America Fund*, WC Docket No. 11-42, WC Docket No. 09-197, WC Docket No. 10-90; FCC 16-38, 31 F.C.C. Rcd. 3962 (rel. April 27, 2016). It was published in the Federal Register on May 24, 2016. 81 Federal Register 33025 (May 24, 2016), available online at: https://federalregister.gov/a/2016-11284.

## III. RELATED CASES:

This case has not previously been before this Court or any other court. Twelve States filed a separate appeal of this order on June 30, 2016 before this Court. It was docketed as DC Circuit No. 16-1219. It was subsequently consolidated with NARUC's appeal. NARUC is not aware of any other appeals of this order in any United States Court of Appeals.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure and Circuit Rule 26.1, the National Association of Regulatory Utility Commissioners (NARUC) respectfully submits this disclosure statement. NARUC is a quasi-governmental nonprofit organization founded in 1889 and incorporated in the District of Columbia. NARUC is a "trade association" as that term is defined in Rule 26.1(b). NARUC has no parent company. No publicly-held company has any ownership interest in NARUC. NARUC represents those government officials in the fifty States, the District of Columbia, Puerto Rico, and the Virgin Islands, charged with the duty of regulating, *inter alia*, the regulated electric utilities within their respective borders.

**Respectfully submitted,**

**/s/ J. Ramsay**

***James Bradford Ramsay***
**GENERAL COUNSEL**
**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS**
**1101 VERMONT AVE., N.W., SUITE 200**
**WASHINGTON, D.C. 20005**

**Dated: January 30, 2017**

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

CORPORATE DISCLOSURE STATEMENTS ..............................................xvi

TABLE OF AUTHORITIES ...........................................................................xix

GLOSSARY ............................................................................................... xxii

STATEMENT OF JURISDICTION.................................................................1

STATUTES AND REGULATIONS .................................................................1

STATEMENT OF THE ISSUES......................................................................1

PRELIMINARY STATEMENT ......................................................................2

STATEMENT OF THE CASE ........................................................................3

STANDARD OF REVIEW ...........................................................................10

SUMMARY OF ARGUMENT ......................................................................11

STATEMENT OF STANDING .....................................................................12

ARGUMENT ...............................................................................................13

I. The Statute Does Not Permit The FCC To Create An ETC Designation Process That *Ab Initio* Bypasses State Commissions. ..................................13

A. Section 214(e)(2) unambiguously specifies that States "shall" in the first instance designate ETCs. ..........................................................16

B. Section 214(e)(6) only permits the FCC to conduct ETC designations when a carrier is "not subject to the jurisdiction of a State Commission." ..........................................................................17

C. The FCC concedes that, as a matter of federal law, States have jurisdiction to designate ETC's involving broadband/broadband lifeline service. ....................20

D. The characteristics of specific "supported services" cannot override §214(e)(2)'s requirement that States conduct ETC designations. ......21

E. Neither §1302/(§706) nor §254 provide authority to "preempt" the §214(e)(2) State procedure. ....................26

II. Absent Forbearance, the FCC Cannot Limit a Lifeline ETC to Only One of the Listed Supported Services. ....................29

III. Adopted Arguments:

A. The *Order* undermines the Congressional scheme. ....................32

B. The FCC cannot forbear from limits Congress placed on its authority to act. ....................32

C. The new federal procedure is inconsistent with the "Competitive Neutrality" principle. ....................32

CONCLUSION ....................32

CERTIFICATE OF COMPLIANCE ....................33

CERTIFICATE OF SERVICE ....................34

ADDENDUM ....................35

# TABLE OF AUTHORITIES

**Cases** **Page**

*Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692 (D.C. Cir. 2014) ..........................10

*Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493 (D.C.Cir.1996).......................12

**Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
467 U.S. 837 (1984).....................................................................10, 15n.15

*City of Arlington v. F.C.C.*, 133 S.Ct. 1863 (2013) ................................................16

**Louisiana Public Service Commission v. F.C.C.*,
476 U.S. 355 (1986)...........................................................15n.15, 15, 25n.24

*MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994) ....................10

*Minnesota Public Utilities Commission v. F.C.C.*
483 F.3d 570 (8th Cir. 2007) ...............................................................26n.26

*Pittston Coal Group v. Sebben*, 488 U.S. 105, 113 (1988).....................................10

*Tennessee v. F.C.C.*, 832 F.3d 597 (6th Cir. 2016) ................................................27

**Verizon v. F.C.C.*, 740 F.3d 623 (D.C. Cir. 2014)..........................................23, 24

*WWC Holding Co. v. Sopkin*, 488 F.3d 1262 (10th Cir. 2007) ...............................23

**Statutes**

28 U.S.C. § 2342(1) ..........................................................................................1
28 U.S.C. § 2343...............................................................................................1
28 U.S.C. § 2344...............................................................................................1
47 U.S.C. § 151 ................................................................................ xxii, 25n.23
47 U.S.C. § 152 ..........................................................................................25n.23
47 U.S.C. § 153(28) .....................................................................................25n.22
47 U.S.C. §160 ................................................................................1, 6, 7, 12, 29
47 U.S.C. § 214(e) ............................................................... 4, 7, 9, 16, 17, 22, 23
47 U.S.C. § 214(e)(1).............................................................6, 6n.11, 8, 12, 29
47 U.S.C. § 214(e)(2)........................ 2, 4, 5n.9, 6n.11, 7, 8, 11, 13-16, 18-21, 24-26
47 U.S.C. § 214(e)(6)...................................................... 5, 6n.11, 11, 17, 18, 19, 20

47 U.S.C. § 253 ....................14
47 U.S.C. § 254 .................... xxiv, 4, 9, 19, 26
47 U.S.C. § 254(a) .................... xxiii, 4n.7, 6n.11
47 U.S.C. § 254(b) .................... 3n.4, 6n.11, 14, 22, 28
47 U.S.C. § 254(c) ....................xxiii, 6, 6n.11, 7, 15, 22, 28, 29, 30, 31
47 U.S.C. § 254(c)(2).................... xxiii
47 U.S.C. § 254(f) ....................3n.4
47 U.S.C. § 254(i) ....................3n.4
47 U.S.C. § 402(a) ....................1
47 U.S.C. § 1302 (§706(a)).................... 3n.5, 15, 23, 24, 25, 26, 27, 28n.27

**Regulations**

47 C.F.R. §54.101(a) ....................6

**Agency Decisions/Notices**

*FCC Universal Service Support Mechanisms*, (Last accessed January 24, 2017), at: https://www.fcc.gov/general/universal-service. .........29n.28

*Proposed Third Quarter 2016 Universal Service Contribution Factor*, CC Docket No. 96-45, DA-16-658, FCC Notice (June 14, 2016). .................29n.28

*In the Matter(s) of Lifeline and Link Up Reform and Modernization*, F.C.C. Rcd. 3962 (rel. April 27, 2016) (*Order*). ............................ 2, 5, 7-16, 18-24, 26-31

*In the Matter of Connect America Fund*, 26 F.C.C. Rcd. 17663 (2011) ....................5n.9

*In the Matter of Universal Service Contribution Methodology*, 25 F.C.C. Rcd. 15651 (2010)....................25n.25

*In the Matter of Federal-State Joint Board on Universal Service*, 20 F.C.C. Rcd. 6371 (2005). ....................5n.9

*In Re Western Wireless Corporation*, 16 F.C.C. Rcd. 19144(2001). ....................5n.10

*Procedures for FCC Designation of Eligible Telecommunications Carriers Pursuant to Section 214(e)(6)*, 12 F.C.C. Rcd. 22947 (1997). ......................... 18n.19

*In the Matter of Federal State Joint Board on Universal Service*, 12 F.C.C. Rcd 8776 (1997). ........................................................................................ 22

**Miscellaneous**

Akyea Kafui et al., *Survey of State Universal Service Funds 2012* (NRRI July 2012) at iv & 6........................................................................................ 4n.6

*Ex Parte from NARUC General Counsel filed In the Matter of Protecting and Promoting the Open Internet*, GN Docket No. 14-28 (February 19, 2015). ........................................................................................ 25n.21

*Letter from 96 Commissioners representing 37 State Commissions to FCC Chairman Wheeler et. al.*, WC Docket Nos. 11-42 09-197 (March 20, 2016). ........................................................................................ 9n.12

H.R. CONF. REP. 104-458, 210, 1996 U.S.C.C.A.N. 10, 225 (1996). ........................................................................................ 28n.27

143 Cong. Rec. S12568-01, S12568 (November 13, 1997).................. 17n.17

143 Cong. Rec. H10807-02, H10807-08 (November 13, 1997)........... 18n.18

*NARUC Petition for Review*, in this appeal, assigned Case No. 16-1170 on June 3, 2015. ........................................................................................ 12

Peter W. Huber et al., *Federal Telecommunications Law*, Second Edition, at 589 (Aspen Law 1999) ........................................................................ *4n.8*

Weiser, Philip, *Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U.L.Rev. 1692 (2001)........................ 3n.3

***Authorities upon which Petitioner chiefly relies are marked with an asterisk.**

# GLOSSARY

| | |
|---|---|
| ***Act*** | ***Communications Act of 1934, as amended*** |
| | 47 U.S.C. §§ 151 *et seq*. |
| ***1996 Act*** | ***Telecommunications Act of 1996*** |
| | Pub. L. No. 104-104, 110 Stat. 56 (1996) |
| ***FCC*** | ***Federal Communications Commission*** |
| | 47 U.S.C. § 151 (1934). |
| ***Lifeline*** | ***Lifeline Program for Low-Income Consumers*** |
| | Low-Income Support, also called the Lifeline program, assists low-income customers by helping to pay for monthly telephone charges so that telephone service is more affordable From the FCC's Webpage at: https://www.fcc.gov/general/universal-service. Many States Lifeline programs provide additional funds to the same low-income consumers - for example, Vermont provides the greater of $7 or 50% of the basic service charge as a Lifeline subsidy, California provides $13.50, Connecticut $10.42, the District of Columbia $6.50 to $8.50, Kansas $7.77, and Missouri $6.50. Several other States offer $3.50/month, including Arkansas, Minnesota, Nebraska, and Oregon. Idaho's subsidy is $2.50 while New York's subsidy varies. |
| ***E-Rate*** | ***E-Rate Schools & Libraries USF Program*** |
| | Schools and Libraries Support, also known as the "E-Rate," provides telecommunication services (e.g., local and long-distance calling, both fixed and mobile, high-speed data transmission lines), Internet access, and internal connections to eligible schools and libraries. See FCC webpage at: https://www.fcc.gov/general/universal-service. |

| | |
|---|---|
| ***ETC*** | ***Eligible Telecommunications Carriers*** |
| | 47 U.S.C § 214(3)(1) specifies that only common carriers designated as an ETC can receive federal universal service support via the FCC universal support mechanisms. ETC's are required to offer "the services that are supported by federal universal service support mechanisms under section 254(c)" and to "advertise the availability of such services" |
| ***Joint Board*** | ***Federal-State Joint Board on Universal Service*** |
| | In 47 U.S.C. §254(a)(1), the 1996 Act required the creation of a Federal State Joint Board on Universal Service to make initial recommendations "to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations." The board consists of 4 State Commissioners nominated by NARUC, one State Consumer Advocate and three FCC Commissioners. While serving on the board, the State members have all the power and jurisdiction of a federal administrative law judge. In §254(c)(2), Congress specified that this Joint Board "may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms." |
| ***High Cost*** | ***Connect America Fund - High Cost program*** |
| | High-Cost Support (Connect America Fund) provides support to certain qualifying telephone companies that serve high-cost areas, thereby ensuring that the residents of these regions have access to reasonably comparable service at rates reasonably comparable to urban areas. Absent forbearance by the FCC, they must provide all supported services. See the FCC's webpage at: https://www.fcc.gov/general/universal-service. |

| | |
|---|---|
| ***NARUC or Petitioner*** | ***National Association of Regulatory Utility Commissioners***<br><br>NARUC is the Petitioner in the lead case (No. 16-1170) in this consolidated appeal. NARUC is charged in the 1996 Act with nominating its members to serve on the Federal State Joint Board required under 47 U.S.C. 254. NARUC is the acknowledged representative of all its member State Public Utility Commissions from all U.S. States and territories (and the District of Columbia.) |
| ***Order/Lifeline Order*** | ***Order on Review***<br><br>*Third Report and Order, Further Report and Order, and Order on Reconsideration*, in the proceeding captioned: *In the Matter(s) of Lifeline and Link Up Reform and Modernization; Telecommunications Carriers Eligible for Universal Service Support, Connect America Fund*, WC Docket No. 11-42, WC Docket No. 09-197, WC Docket No. 10-90; FCC 16-38 (rel. April 27, 2016) and published at 81 Federal Register 33025 (May 24, 2016). |
| ***Rural Health*** | ***Rural Health Care Support***<br><br>Rural Health Care Support allows rural health care providers to pay rates for telecommunications services similar to those of their urban counterparts, making telehealth services affordable, and also subsidizes Internet access. (From the FCC's webpage at: https://www.fcc.gov/general/universal-service) |
| ***Mechanisms*** | ***Universal Service Support Mechanisms***<br><br>The Universal Service Support Mechanisms are Lifeline, Connect America/High Cost, E-Rate, and Rural Healthcare. *See, FCC Universal Service Support Mechanisms, at:* https://www.fcc.gov/general/universal-service (Last accessed January 24, 2017). |

## STATEMENT OF JURISDICTION

The *Lifeline Order* is final and appealable under 47 U.S.C. §402(a) and 28 U.S.C. §2342(1). The Commission (FRAP 15(a)) and the United States (28 U.S.C. §2344) are proper respondents. Venue is proper under 28 U.S.C. §2343. The *Order* was published May 24, 2016. The Petition was filed within 60 days.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the Addendum.

## STATEMENT OF THE ISSUES

(1). Whether the statute permits the Federal Communications Commission ("FCC") to create a designation process that *ab initio* bypasses States.

(2). Whether, without use of its 47 U.S.C. §160 forbearance authority, the FCC can allow a designated carrier to provide only one of the supported services.

(3). Whether the FCC can forbear from conditions limiting its authority to act.

## PRELIMINARY STATEMENT

In 1996, Congress required the FCC and State Commissions to work together to assure universal telecommunications services. States were assigned crucial tasks, in part, to assure State and federal programs meshed efficiently. 47 U.S.C. §214(e)(2) specifies States designate carriers as Eligible Telecommunications Carriers ("ETCs"). Only ETCs can receive federal universal service subsidies.

Today, both federal and State Lifeline programs provide discounts to low-income customer for telecommunications services.

The *Order* on review purports to preempt the §214(e)(2) State designation process for Lifeline ETCs that are "broadband only." The express purpose is to allow carriers to bypass any State oversight. Carriers gain access to federal subsidies to operate in specific States – bypassing both oversight and State Lifeline subsidies targeting the low income consumers being served. The long term impact of this approach on State programs, on Lifeline consumers, and service quality – is easily discerned. But the clear affront to Congressional authority cannot be countenanced. The Court must vacate the *Order* below.

## STATEMENT OF THE CASE

Since 1985[1] the FCC's Lifeline program has provided a federal discount to low-income customer phone bills. In the *Telecommunications Act of 1996* ("1996 Act"),[2] Congress integrated Lifeline into a suite of federal universal service mechanisms. The 1996 Act created a structure that requires the FCC to work hand-in-glove with State Commissions.[3] Like the FCC, State commissions are *affirmatively charged* by Congress to "preserve and advance universal service,"[4] and to encourage deployment "of advanced telecommunications to all Americans."[5]

---

1 *Order*, ¶3(J.A. __)

2 Pub.L.104-104, 110 Stat. 56., amending the *Communications Act of 1934*, Pub. L. No. 73-416(1934)("Act").

3 *Weiser, Philip, Federal Common Law, Cooperative Federalism, and the Enforcement of the Telecom Act*, 76 N.Y.U.L.Rev. 1692, 1694 (2001) (describing the 1996 Act as "the most ambitious cooperative federalism regulatory program to date").

4 *See*, 47 U.S.C. §254(b)(5)("should be specific . . . federal and state mechanisms to advance universal service"); §254(f) (authorizing state programs); §251(f)(States can exempt rural carriers from certain requirements.); and §254(i)(FCC and States should insure universal service at reasonable rates.)

5 *See*, 47 U.S.C. §1302(a)(specifying the FCC and State Commissions "shall" encourage the deployment of advanced telecommunications.")

***State universal service programs are a crucial component of Congress's plan.***

Forty-three States have State-funded programs. Many provide subsidies that complement FCC mechanisms for: Lifeline service (23), high-cost companies (21), and broadband (4).[6] State Lifeline programs provide subsidies ranging from $2.50 to $13.50 per month that add to the FCC Lifeline discount for low income consumers.

***The 1996 Act assigns States key roles to facilitate a coordinated approach.***

Congress established a Federal-State Joint Board composed of a majority of State Commissioners, along with FCC Commissioners and a consumer advocate, to recommend how to implement §214(e) and §254 "including the definition of the services that are supported," by the federal mechanisms.[7] Among the other "affirmative duties" imposed, Congress required "State commissions to designate the telecommunications carriers eligible to receive support in exchange for their provision of the universal service package."[8]

The FCC has repeatedly confirmed that "Section 214(e)(2) of the Act provides state commissions with the *primary* responsibility for performing ETC

---

6 Kafui Akyea et al., *Survey of State Universal Service Funds 2012* (NRRI July 2012) at iv & 6.

7 47 U.S.C. §254(a)(1)

8 Peter W. Huber et al., *Federal Telecommunications Law*, Second Edition, at 589 (Aspen Law 1999) (citing §214(e)(2)).

designations."[9] The subsequently added §214(e)(6), however, only permits the FCC to take over the designation process, where "a common carrier providing telephone exchange service and exchange access . . . is not subject to the jurisdiction of a State Commission."[7]

As the FCC explained, in 2001:

> Under section 214(e)(6), the Commission is effectively authorized to stand in the place of the state commission for purposes of designating carriers over which the state does not have jurisdiction . . . [T]he Commission's authority to perform the designation is no greater than that of the state that would have otherwise made the designation.[10]

Indeed, as Commissioner Pai's dissent, p. 4175(J.A. ___), pointed out, there was *no* back-up role for the FCC in the 1996 Act; §214(e)(6) was added a year later because carriers not subject to the jurisdiction of any State commission could not otherwise be designated.

---

9 *In the Matter of Federal-State Joint Board on Universal Service*, 20 F.C.C. Rcd. 6371, 6374 ¶8 (Mar. 17, 2005); *see also, id.* at ¶61, noting "[§]214(e)(2) demonstrates Congress's intent that state commissions evaluate local factual situations in ETC cases." *See also, In the Matter of Connect America Fund*, 26 F.C.C. Rcd. 17663 at 17798 (2011) ("By statute, the states…are empowered to designate common carriers as ETCs" and specifying in note 622 that "[S]tates have primary jurisdiction to designate.")

10 *In Re Western Wireless Corporation.* 16 F.C.C. Rcd. 19144, 19147(2001).

***ETCs must provide all supported services.***[11]

47 U.S.C. §160 permits the FCC to "forbear" to relieve the application of "any provision of this Act" or "any regulation" required by specific provisions of the Act.

The *Order* specifies in amended 47 C.F.R. §54.101(a):

> *Services designated for support*. Voice telephony services and broadband service shall be supported by federal universal service support mechanisms.

Section 214(e)(1) requires ETCs to "advertise" and "offer the services that are supported by the Federal universal service support mechanisms under §254(c)." Absent forbearance, each ETC, *however designated*, must comply with §214(e)(1).

***The Order***

Since 1997, the FCC has consistently found that the plain text of the statute:

- Places the designation process, in the first instance, with States; and
- Absent forbearance, requires Lifeline ETCs to provide all supported services.

On April 27, 2016, that changed. The *Order*, at ¶223(J.A. __), keeps "the existing, statutorily compelled paradigm for providing Lifeline service" by continuing to require all "Lifeline providers be designated as ETCs."

---

[11] 47 U.S.C. §254(a)(1)-(2), (b)(5), (c)(2) & §214(e)(1)-(2), & (6).

But the FCC finds other aspects of the "existing statutorily compelled paradigm" less persuasive.

The *Order*, at ¶229(J.A. __), "interpret[s] section 214(e) to permit carriers to obtain ETC designations specific to particular service," establishes a Lifeline broadband provider ETC designation and "preempts" the §214(e)(2) State designation process for just the new broadband Lifeline category.

This new type of Lifeline ETC is only required to provide one supported service - broadband. It can *only* be designated by the FCC.

The FCC found no §160 forbearance was necessary to ignore §214's requirement that designated carriers must "offer" and "advertise" all the "services that are supported by the federal universal service support mechanisms defined in §254(c)."

This even though the *Order*, at ¶297-298(J.A. ___), inconsistently, finds it necessary to forbear "from Lifeline-only ETCs obligations to offer [broadband] to permit such ETCs to solely offer voice if they so choose," and with respect to ETC's that are *not* Lifeline only, when it forbears from requiring such ETC's to provide Lifeline-supported broadband service with voice service in certain areas.

Atypically, the *Order* did <u>not</u> discover an ambiguity in §214(e)(2) as a prelude to severely restricting States' ability to act as an active partner in promoting universal service. This is understandable. The text is clear. The

agency has never in the 20 year history of this provision found any ambiguity. None exists. Instead, the *Order* presents a deeply flawed, analysis. Choosing to ignore the U.S. Constitutions' concept of separation of powers, along with the clear text and unambiguous structure of the 1996 Act, the FCC purports to "preempt" not a *State* law or regulation, but the §214(e)(2) *Congressional* specification of the State's role under the Act.

This flawed view of an Agency's ability to specify the scope of its own powers absent any statutory tether misappropriates Congressional authority. According to the *Order*, at ¶249(J.A. __), States performing designations, consistent with the §214(e)(1) mandate for this new category will "thwart federal universal service goals and broadband competition, and accordingly we preempt such designations." After preempting authority granted by §214(e)(1), the FCC predictably finds "[i]n the absence of state jurisdiction to designate providers as LBPs [Lifeline Broadband Providers], the Commission has authority to designate such ETCs under Section 214(e)."

To compound the illogic of its approach, the *Order*, at ¶287(J.A. __), concedes that States have jurisdiction over Lifeline broadband internet access services for their own programs and for other Lifeline-only ETCs and other ETCs that provide more than just Lifeline services.

Commissioner O'Rielly, at p. 4182(J.A. __), argued the FCC had "absolutely mangled section 214," and joined the current FCC Chairman Ajit Pai, at p. 4175(J.A. __), in filing separate and strong dissents pointing out the FCC lacks authority to bypass the State designation procedure.

Ninety-six Commissioners from thirty-seven States signed a letter explaining the impact if the FCC chose to bypass the §214 procedure.[12] It also explained how the *Order* is inconsistent with crucial Congressional goals. The new process, which takes State "cops" off the beat for broadband Lifeline services, can only increase fraud and abuse, directly undermine existing complementary State Lifeline programs sanctioned by Congress in §254, and undermine service quality for Lifeline consumers.[13]

Congress expected low income consumers to have access to State and federal universal service programs. Now, the federally designated ETC will choose whether to seek a State-level designation. *This means ETCs will decide if consumers in that State will have access to any additional State Lifeline subsidies*.

---

12 *See, Letter from 96 Commissioners representing 37 State Commissions to FCC Chairman Wheeler et. al.*, WC Docket Nos. 11-42 09-197 (March 20, 2016). Although the FCC did not go with its original proposal, the impact is the same.

13 *Order* at ¶227(J.A. __)(noting where States retain designating authority, the State process ensures "that carriers have the financial and technical means to offer service, including 911 and E911, and have committed to consumer protection and service quality standards.") *See also Pai Dissent*, p. 4168-4169(J.A. __)

At a minimum, the *Order's* establishment of a designation process different from that specified by Congress - should be vacated. The Court should also specify that absent forbearance, ETCs must provide all supported services.

## STANDARD OF REVIEW

Under *Chevron*, agencies are not entitled to deference where a court, after "considering the text, structure, purpose, and history of an agency's authorizing statute," can "determine [that] a provision reveals congressional intent about the precise question at issue." *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 696 (D.C. Cir. 2014). Moreover, an agency "interpretation of a statute is not entitled to deference when it goes beyond the meaning the statute can bear." *MCI Telecommunications Corp. v. AT&T*, 512 U.S. 218, 229 (1994) (citing *Pittston Coal Group v. Sebben*, 488 U.S. 105, 113 (1988); *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-843 & n9. (1984)).

## ARGUMENT SUMMARY

The *Order* displays a purposeful disregard of the Congressional scheme and lack of reasoned decision-making.

There can be no doubt what Congress intended.

Congress specified that State commissions, in the first instance, designate *all* ETCs. 47 U.S.C. §214(e)(2). Designation is a pre-requisite to receiving federal universal service subsidies.

The *Order*, at ¶249(JA __), claims to "preempt" that §214(e)(2) State procedure based on the facially illogical claim that this Congressional mandate "thwart[s] federal universal service goals." Instead, the *Order* permits *only* the FCC to designate a new category of the federal Lifeline carriers - Lifeline broadband internet access service providers.

The purported preemption is based in part on §214(e)(6), which allows the FCC to conduct ETC designations when the carrier is "not subject to State jurisdiction." Elsewhere, the *Order*, concedes States have jurisdiction as a matter of law to designate ETCs that also provide broadband and broadband Lifeline services – and to implement State programs to do the same thing.

The new procedure undermines the Congressional scheme. It undermines State universal service programs, service quality to the end-user, and increases the changes for ETC fraud and abuse. It also allows the new "federal" ETC's to

decide, in the first instance, if low income customers in a particular State will have access to that State's Lifeline subsidy.

Congress also specified that ETCs must, absent forbearance, provide all supported services. 47 U.S.C. §214(e)(1) & §160.

The *Order* again ignores Congressional instructions allowing, with no forbearance, the new FCC-designated ETCs to only provide one supported service, while simultaneously, correctly exercising forbearance authority to permit other ETCs to offer only one supported service. *Order* ¶297-298(JA __).

The FCC cannot, however, use forbearance to eliminate conditions Congress placed on provisions granting the agency its authority to act as a backstop to State designations.

The Court should insure fidelity to Congressional intent. These aspects of the *Order* must be vacated.

## <u>STATEMENT OF STANDING</u>

NARUC's members are *sui generis*, charged by Congress with implementing the federal law "preempted" by the *Order*, which also undermines complementary State programs. *See*, *NARUC Petition for Review*, at 3-10. *Bristol-Myers Squibb Co. v. Shalala*, 91 F.3d 1493, 1497 (D.C.Cir.1996).

## ARGUMENT

### I. The Statute Does Not Permit The FCC To Create An ETC Designation Process That *Ab Initio* Bypasses State Commissions.

There was a reason for the strident dissents to this *Order*. This case undermines the balance of authority between the Executive branch and Congress.

The FCC cannot preempt Congress. Yet that is exactly what the *Order* attempts.

The FCC's contorted rationale for "preemption" is difficult to unravel. The "conflict" the FCC used to justify the "preemption" the *Order* references is not a conflict between State and federal law. It is conflict between Congress's explicit requirement in §214(e)(2) that States, in the first instance, conduct ETC designations and *the FCC's view of how the statute should be implemented*.

This FCC argument takes bootstrapping to a whole new level.

The FCC is arguing it can claim a State does not have jurisdiction as a matter of federal law when Congress has already specified States do.[14] The FCC finds, at ¶249(J.A. __), that Congress's §214(e)(2) mandate that States conduct ETC designations, will:

> thwart federal universal service goals and broadband competition, and accordingly we preempt such designations.

---

[14] Whether a particular State has jurisdiction as a matter of State law is not at issue.

After "preempting" State "designations" the FCC finds in the following sentence that in "the absence of state jurisdiction to designate" that "the Commission has authority to designate such ETCs under section 214(e)(6)."

At ¶251)(J.A. __), again the FCC argues, as a basis for "preemption", that the §214(e)(2) mandate:

> conflicts with our implementation of the universal service goals of section 254(b) in the Lifeline broadband rules adopted in this Order.

Footnote 672 to this ¶251(J.A. __) argument cites the U.S. Constitution's Supremacy Clause and cases focused on preemption of *State* law. But there is no Federal-State law conflict – *only a conflict between the FCC's aspirations and the Congressionally-mandated State designation process in §214(e)(2).* Accordingly, none of those cases are relevant. The FCC's is apparently arguing its implementing regulations "preempt" the Act by virtue of the Supremacy Clause – at best, an illogical formulation.

The broadest grant of preemptive authority in the 1996 Act - 47 U.S.C § §253(a) - grants the FCC explicit permission to preempt any State law that could inhibit any carrier from providing any "telecommunications service" (like Lifeline broadband). However, subpart (b) bars the FCC from preempting any State universal service requirements – even if they reduce "interstate" competition – as long as they are "imposed on a competitively neutral basis."

Congress flatly will not countenance preemption of State universal service laws, even if those laws could inhibit "competition" in interstate services. How much less likely is it that Congress would permit the FCC's *sub silentio* "preemption" of the explicit §214(e)(2) mandate because the agency thinks the structure Congress established is not optimum.

The FCC alleges, §254(c) and §1302 present some general "conflict" with the §214(e)(2) mandate that it took 20 years to discover. To the extent there is any conflict, then, as Pai's dissent, at p. 4175(J.A. __), points out, §214(e)(2) controls because it is a more specific instruction.

The *Order* cites zero precedent where any agency purported to "preempt" a mandatory Congressional directive because that agency did not think the directive was optimum.

There are no such precedents.

It is axiomatic that an agency may not confer power upon itself:

> [W]e simply cannot accept an argument that the FCC may nevertheless take action which it thinks will best effectuate a federal policy. An agency may not confer power upon itself. To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress.[15]

---

15 *Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 374–75(1986); *compare, Chevron*, 467 U.S. at 843 n.9("The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent.")

The issue is always "whether the statutory text forecloses the agency's assertion of authority, or not." *City of Arlington v. F.C.C.*, 133 S.Ct. 1863, 1871 (2013). Here, the plain text of §214(e) forecloses creation of a new designation procedure.

### A. Section 214(e)(2) unambiguously specifies that States "shall" in the first instance designate ETCs.

The Court need go no further than a simple examination of §214(e)(2).

The section specifies, as a matter of federal law, the States' authority to – *and mandates they shall* – designate ETCs:

> A State commission *shall* upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission.

47 U.S.C. § 214 (e)(2)

The text is clear. As a matter of federal law (i) Congress grants authority for States to conduct designations and (ii) States have to designate <u>all</u> ETCs, in the first instance, before they can receive any federal subsidy.

The FCC does not claim anywhere in the *Order* that there is an ambiguity in <u>this</u> section. Indeed, the agency has consistently acknowledged it provides State commissions with responsibility for ETC designations.[16] Even under the *Order*,

---

[16] *See* footnote 10, *supra*.

States retain that primary responsibility for all but the newly-created Lifeline broadband ETCs.

### B. Section 214(e)(6) only permits the FCC to conduct ETC designations when a carrier is "not subject to the jurisdiction of a State Commission."

Until 1997, there was no way to get an ETC designation if a State could not do it. Federal statutes cannot grant a State commission authority the State itself denies. A State agency only has authority to act, if it has been given jurisdiction by its State legislature or constitution.

Congress did not recognize this as a problem in the 1996 Act.

But in 1997, Senator McCain did, stating §214(e) "does not account for the fact that State commissions in a few States have no jurisdiction over certain carriers."[17] He was responding to companies that could not get designated because the Arizona Corporation Commission lacked jurisdiction over them under State law. Arizona did designate other carriers. With a State designation, those carriers could not get federal high cost or lifeline universal service subsidies. McCain's amendment added §214(e)(6) which allows the FCC to designate only when the State lacks jurisdiction. However, the amendment "does nothing to alter" State commissions' "existing jurisdiction." *Id.* In the U.S. House of Representatives,

[17] 143 Cong. Rec. S12568-01, S12568 (1997)

sponsors of McCain's bill agreed "nothing in this bill is intended to *restrict* . . . the existing jurisdiction of State commissions over any common carrier."[18]

The FCC responded to the new law by requiring applicants to certify that they were "not subject to the jurisdiction of a state commission" as a matter of State law, before the FCC would consider them for designation.[19]

On their face, §§214(e)(2) and (6) make clear the FCC cannot conduct an ETC designation, unless the relevant State commission lacks State jurisdiction over the carrier.

But the *Order*, ignores the plain text, the legislative history, and the FCC's own precedent to claim that §214(e)(6) permits it to "preempt" the role Congress specifies States conduct.

The FCC relies heavily on a tortured exegesis of §214(e)(6) to "preempt" §214(e)(2). Basically it suggests the provision gives the "FCC authority to designate where States lack jurisdiction," *Order* at ¶4(J.A. __), regardless whether the State has, as a matter of State law, jurisdiction to act.

But Congress already has decided.

---

18 143 Cong. Rec. H10807-02, H10807-08 (1997).

19 *Procedures for FCC Designation of Eligible Telecommunications Carriers Pursuant to Section 214(e)(6),* 12 F.C.C. Rcd. 22947 (1997)

Or to use another *Order* formulation, at ¶285 n. 685(J.A. __), the FCC is free to preempt:

> any otherwise-existing state law authority to perform ETC designations based on conflicts with federal policy, including the policy objectives identified in section 254 of the Act and section 706 of the 1996 Act and the Commission's implementing rules.

This approach directly conflicts with the statutory text – as well as other declarations in the *Order*. (*See* Argument C., *infra*).

Congress has already decided in §214(e)(2) that – as a matter of federal law – States have jurisdiction to conduct all designations. That's why the McCain amendment was necessary.

The FCC is not free to make a contrary determination – as a matter of federal law – based on §214(e)(6).

Like §214(e)(2), §214(e)(6), lacks ambiguity:

> In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law.

On its face, the section only permits the FCC to conduct ETC designations as a default to States specifically where the carrier is "not subject to the jurisdiction of a State Commission." This text must refer to whether the State actually has

jurisdiction as a matter of State law, because, as noted *supra*, Congress has already decided States do have jurisdiction as a matter of federal law. This reading is also consistent with the §214(e)(6) requirement for the service area to be "consistent" with applicable State law.

### C. The FCC concedes that, as a matter of federal law, States have jurisdiction to designate ETC's involving broadband/broadband Lifeline service.

The FCC argues it can use §214(e)(6) to say the States lack jurisdiction and "preempt" Congress §214(e)(2) mandate. But §214(e)(6) doesn't say "where the FCC finds State jurisdiction to be inefficient." It says where the carrier is "not subject to the jurisdiction of a State Commission."

In ¶¶239-273(J.A. __), the FCC tries to rationalize why it can "preempt" because the States "lack jurisdiction." But there is no reason to wade through the FCC's dystonic rationale because, the *Order* explicitly concedes that States DO have jurisdiction as a matter of federal law over Lifeline Services and even over standalone Lifeline broadband services, at ¶287(J.A. __) specifying:

> Nothing in this Order preempts states' ability to create or administer such State-based Lifeline programs that include state funding for <u>Lifeline support to support</u> voice service, <u>[broadband service]</u>, or both.

And at ¶286(J.A. __) stating:

> Nor does the creation of the [FCC Lifeline broadband] designation disturb states' current processes for designating non-[FCC designated Lifeline Broadband] ETCs, *where they retain jurisdiction*."

(emphasis added)

Note the italicized reference to the same State jurisdiction the FCC claims to have preempted elsewhere.

By definition, "non-Lifeline-only" and some "Lifeline only" ETCs designated by States will be providing broadband services.[20]

The *Order* confirms, what §214(e)(2) requires: that each State Commission, as a matter of federal law, has jurisdiction over broadband services. Clearly, without such authority, States could not "create or administer" a State program to support lifeline broadband service on a standalone basis or certify any ETCs that receive federal Lifeline subsidies for providing broadband service.

**D. The characteristics of specific "supported services" cannot override §214(e)(2)'s requirement that States conduct all ETC designations.**

The FCC clearly concedes that, as a matter of federal law, States have jurisdiction sufficient to create their own broadband Lifeline programs and manage

20 "ETCs that are not [certified by the FCC] may also be eligible to receive reimbursement for offering Lifeline-supported broadband Internet access service" *Order*, ¶8n.4(J.A. __). (emphasis added).

high cost carriers providing broadband services. But the *Order* implies that the character of broadband service as "interstate" somehow limits Congress's ability to specify that States, in the first instance, conduct all ETC designations.

But the nature of the underlying service is irrelevant. It cannot limit Congress. It makes no sense to suggest otherwise.

Congress can and did specify that States conduct ETC designations for all supported services. At the same time, it also specified in §254(b)(2)&(c) that such "supported services" will continue to evolve and must include "[a]ccess to advanced telecommunications and information services." Indeed, the order implementing §214(e) specified that universal service support mechanisms would, as Congress intended, support a suite of designated services – including voice grade access to "interexchange" service (which includes interstate services). *In the Matter of Federal State Joint Board on Universal Service*, 12 F.C.C. Rcd at 8810-8011(1997).

Even the structure of §214(e) confirms what the text of subpart (2) requires. As Commissioner Pai pointed out in his dissent, at p. 4175(J.A. __):

> Congress expressly chose to limit state authority to intrastate services only in unserved areas . . . In other words, Congress knew how to draw a jurisdictional line in §214, but chose not to do so outside of unserved areas. And that same paragraph makes another thing clear: In unserved areas, the FCC can designate *both* a carrier with respect to interstate services *as well as* a "carrier to which paragraph (6) applies," i.e., a carrier not

> subject to the jurisdiction of a state commission. That parallel construction means Congress viewed the questions as separate and distinct—not one and the same. So to now draw another line around state commission jurisdiction would be to rewrite subsection 214(e), not reinterpret it.
>
> (footnote omitted; emphasis in the original)

But §214(e) is not the only place Congress gives States authority over interstate services in the 1996 Act. For example, this Court, in *Verizon v. F.C.C.*, 740 F.3d 623, 638 (D.C. Cir. 2014), observed that §1302(a)/(§706(a)) applies to both the FCC

> '*and* each State commission with regulatory jurisdiction over telecommunications services.' (emphasis added), Verizon contends that Congress would not be expected to grant both the FCC and state commissions the regulatory authority to encourage the deployment of advanced telecommunications capabilities. But Congress has granted regulatory authority to state telecommunications commissions on other occasions, and we see no reason to think that it could not have done the same here.

*WWC Holding Co. v. Sopkin*, 488 F.3d 1262, 1271–72 (10th Cir. 2007) provides another example:

> Congress was well aware that mobile services, "by their nature, operate without regard to state lines as an integral part of the national telecommunications infrastructure,". . .Yet, at the same time, Congress decided to permit a state to regulate the "other terms and conditions" of a mobile service provider, with no explicit limitation on whether a state's regulations affect the provision of interstate service.

There is no reason to carry this investigation further.

However, the *Order* attempts to muddy the waters, at ¶255(J.A. __), by pointing out the agency has previously found broadband Internet access service is "jurisdictionally interstate for regulatory purposes." At ¶240(J.A. __) it argues:

> The circumstances in which a carrier is "not subject to the jurisdiction of a State commission" under section 214(e)(6) is ambiguous regarding whether the carrier must be entirely outside the state commission's jurisdiction or only outside the state commission's jurisdiction with respect to a particular service supported by universal service mechanisms, even if subject to state commission jurisdiction in other respects.

But §214(e)(6) is not ambiguous given the clear specification in §214(e)(2) that, as a matter of federal law, States do the designations. If the service is supported by the federal mechanisms, States do the designations.

The FCC's purported ability to otherwise, in appropriate cases, preempt some aspects of State oversight of mixed services cannot translate into the ability to preempt Congress.

Assuming *arguendo*, this FCC diversion is worth closer scrutiny, the flaws only increase. Even absent §214(e)(2) and the FCC concessions cited, *supra*, States have jurisdiction with respect to broadband. Even the *Order*, at ¶255(J.A. __), recognizes State have jurisdiction to collect data regarding broadband services. And as the *Verizon* decision, *supra*, notes, 47 USC §1302(a) specified that "each State commission with regulatory jurisdiction over telecommunications

services shall" encourage the deployment of "advanced services" though *substantive* measures.

Even if these §1302 and §214(e)(2) Congressional specifications were not enough, broadband is jurisdictionally mixed,[21] containing both inter- and intrastate communications.[22] If there are intrastate transactions, States have jurisdiction.[23] In other contexts *not implicated here,* to the extent the traffic cannot be "severed", i.e., identified as either interstate or intrastate, the FCC may have the option, but does not have to, preempt State polices under the so-called "impossibility exception."[24] A series of FCC rulings about so-called nomadic Voice over Internet protocol services provide a clear example.[25] These nomadic

---

[21] *See, Ex Parte from NARUC General Counsel filed In the Matter of Protecting and Promoting the Open Internet*, GN Docket No. 14-28 (February 19, 2015).

[22] 47 U.S.C. §153(28) defining interstate and, by exclusion, intrastate services.

[23] *See*, 47 U.S.C. §151 limiting the FCC's jurisdiction to interstate and in §152(b) confirming that limitation by reserving State jurisdiction over intrastate services.

[24] *Louisiana Public Service Commission v. F.C.C.*, 476 U.S. 355, 368 (1986) ("Pre-emption occurs . . . when there is outright or actual conflict between federal and state law . . . where compliance with both federal and state law is in effect physically impossible.")

[25] *In the Matter of Universal Service Contribution Methodology*, 25 F.C.C. Rcd. 15651, 15657–58, ¶15(2010). (FCC found "no basis at this time to preempt states from imposing universal service contribution obligations on providers of nomadic interconnected VoIP service.")

services use the public internet to complete voice calls. According to the 8th Circuit:

> [T]he "impossibility exception" of 47 U.S.C. § 152(b) allows the FCC to preempt state regulation of a service if (1) it is not possible to separate the interstate and intrastate aspects of the service, and (2) federal regulation is necessary to further a valid federal regulatory objective, i.e., state regulation would conflict with federal regulatory policies. [26]

But the impossibility exception, like the earlier-referenced citation to the Supremacy Clause, has no application here because, the FCC is not trying to preempt State regulation. It is trying to block a Congressionally-specified designation procedure.

*But even if the exception did apply*, how can the FCC plausibly argue that a State following the §241(e)(2) Congressional mandate conflicts with federal policy.

### E. Neither §1302/(§706) nor §254 provide authority to "preempt" the §214(e)(2) State procedure.

In ¶255, the *Order* argues that §1302/(§706) provides it with authority to preempt the § 214(e)(2) State designation procedure. But §1302/(§706) provides no support for the FCC's position. It certainly does not provide statements sufficient to override the specific instructions of §214(e)(2).

---

[26] *Minnesota Public Utilities Commission v. F.C.C.*, 483 F.3d 570, 578 (8th Cir. 2007)

As Chairman Pai's dissent, at p. 4176-4177(J.A. ___), points out, the FCC "cannot rely" on §1302/(§706) to overcome §214 because:

> it's "a commonplace of statutory construction that the specific governs the general,"[] especially "where Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions."[] Because section 214 specifically assigns the authority for ETC designation to state commissions and section 706 says nothing whatsoever about that authority, the former must trump the latter.
>
> (footnotes omitted)

The FCC decision the *Order* cites in n.676(J.A. __) as support is irrelevant.

First, because the FCC effort to use §1302/(§706) to preempt State laws in that case was rejected on appeal. *Tennessee v. FCC*, 832 F.3d 597 (6th Cir. 2016).

Second, because in the cited case, the FCC was relying on §1302/(§706) to preempt *State* law – *not another part of a federal statute*.[27]

The *Order's* ¶¶31 & 251 (JA __) references to §254(b)&(c) have the similar flaws. Section 254(c) specifies federal state cooperation, *inter alia*, referencing the Federal State Joint Board, which has a majority of State Commissioners, twice with respect to defining "supported services," and nowhere mentions preemption.

[27] Even if State preemption *were* at issue, §1302(a)((§706(a)) provides no support for the FCC argument. The section specifies that the FCC and State commissions "shall encourage the deployment" of advanced telecommunications and lists measures to "remove barriers to infrastructure investment." Preemption is *not* one of the enumerated methods. Indeed, inferring that it permits preemption of States seems counter-intuitive as it also explicitly recognizes a co-equal role for States. Use of §1302(b)(§706(b)) as the source of preemptive power is similarly flawed. Any "preemptive" authority granted by §1302(b)(§706(b)) exists *only as long as there are FCC findings that broadband is not being deployed in a timely/reasonable fashion*. That makes it unlikely Congress expected the FCC to preempt State law based on that subpart. The legislative history supports this view. In the conference report, the Senate version of §1302(b)/(§706(b)) authorized the FCC, if broadband was not being reasonably deployed, to "preempt State commissions that fail to act to ensure" advanced services. But Congress decided to eliminate that text from the conference bill. H.R. CONF. REP. 104-458, 210, 1996 U.S.C.C.A.N. 10, 225 (1996).

## II. Absent Forbearance, the FCC Cannot Limit a Lifeline ETC to only One of Listed Supported Services.

There are four *Universal Service Support Mechanisms:*[28] Lifeline, High Cost, Schools and Libraries/E-Rate and Rural Health Care. Section 254(c)(3) allows the FCC "to designate additional services for such support mechanisms for schools and libraries, and health care providers." It does not provide similar flexibility for the Lifeline and High Cost mechanisms.

However designated, ETC must meet "the requirements of" §214(e)(1), which requires that carrier to " offer the services that are supported by the Federal universal service support mechanisms under §254(c)."

Section §160 does permit the FCC to "forbear" to relieve the application *to a carrier* of "any provision of this Act".

But absent forbearance, ETCs must provide all "supported services."

The *Order* effectively concedes this point when it forbears at ¶298(J.A. ___) "from lifeline-only ETCs obligations to offer [broadband] to permit such ETCs to solely offer voice if they so choose," and at ¶297(J.A. ___) with respect to ETCs that are *not* Lifeline only, when they forbear from requiring such ETCs to provide

---

[28] *See, FCC Universal Service Support Mechanisms, at:* https://www.fcc.gov/general/universal-service (Last accessed January 24, 2017). *Compare, Proposed Third Quarter 2016 Universal Service Contribution Factor*, CC Docket No. 96-45, DA-16-658, FCC Notice (June 14, 2016).

Lifeline-supported broadband service, except in certain areas.[29] Indeed, the *Order* captions its discussion of forbearance for ETCs that are not Lifeline only, at ¶311(J.A. __) "Obligation to offer all supported Services."

But the *Order* maintains it can simply establish a Lifeline Broadband Provider category and specify it need only offer one of the two defined supported services, in ¶¶ 242-248(J.A. __), explaining why it can ignore the statute's requirements.

First it argues at ¶242(J.A.___) that it already has "adopted an interpretation of §254(c)(1) that enables it to define universal service(s) under section 254(c)(1) that differs among . . .different universal service mechanisms."

True the "supported services" in the cited E-Rate program is different. But, as noted earlier, Congress specified in §254(c)(3) that the services in that program *could* be different.

From this, ¶245(J.A. __) specifies that the FCC can misread "mechanisms" to mean "mechanism" – in the §214(e)(1)(A) requirement that ETC's "offer the services" that are supported by "universal service mechanisms" The FCC contends to read it as it is actually written would require all ETCs (including Lifeline and

---

[29] *See also, Order* at ¶285(J.A. __) ("[E]xisting ETCs also retain the option to avail themselves of forbearance from the obligation to offer broadband."); at ¶325 (J.A. ___) ("declining to forbear from existing Lifeline only ETC obligations to offer discounting voice services").

High Cost ETCS) to offer the additional services Congress permitted the FCC to designate for the schools. But that's incorrect. ETCs are only required to "offer the services that are supported by federal universal service support mechanisms' under section 254(c)." And §254(c) in turn, provides the *definition* of supported services and clearly indicates the defined services under the Schools and Libraries Program can be different. This facially-flawed admittedly-incorrect reading of the text does not provide any basis for permitting, absent forbearance, a class of carriers providing Lifeline service to only offer one of the two supported services specified by this *Order*.

The *Order* next notes it has "also has granted carriers forbearance from the 'own facilities' requirement in section 214(e)(1) to enable pure resellers to be designated as ETCs, conditioned on them only obtaining Lifeline universal service support." This citation, referenced to support the *Order*s actions, seems on its face to undermine the notion that they can permit a Lifeline provider to provide only one supported service absent forbearance.

## III. Adopted Arguments

To avoid repetition, NARUC worked with Intervenor, National Association of State Consumer Advocates to incorporate the following arguments in their brief, *which is still being compiled*. NARUC adopts these arguments by reference.

### A. The *Order* undermines the Congressional scheme.

### B. The FCC cannot forbear from limits Congress placed on its authority to act.

### C. The new federal procedure is inconsistent with the "Competitive Neutrality" principle.

## CONCLUSION

The FCC cannot refuse to enforce what Congress has mandated. This tribunal should confirm the FCC is not free to create a federal designation procedure and vacate the *Order*.

Respectfully submitted,

**/s/ J. Ramsay**

***James Bradford Ramsay***
**GENERAL COUNSEL**
**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS**
**1101 VERMONT AVE., N.W., SUITE 200**
**WASHINGTON, D.C. 20005**
**TEL: (202) 898-2207**
**FAX: (202) 384-1554**
**E-MAIL: JRAMSAY@NARUC.ORG**

**Dated: January 30, 2017**

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) in that this brief contains 6336 words. In making this certification, Joint Petitioners' counsel has relied on the word count function of Microsoft Word, the word processing system used to prepare this brief.

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14 pt. font Times New Roman type style.

**/s/ J. Ramsay**

***James Bradford Ramsay***
**GENERAL COUNSEL**
**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS**
**1101 VERMONT AVE., N.W., SUITE 200**
**WASHINGTON, D.C. 20005**
**TEL: (202) 898-2207**
**FAX: (202) 384-1554**
**E-MAIL: JRAMSAY@NARUC.ORG**

**Dated: January 30, 2017**

## CERTIFICATE OF SERVICE

I hereby certify that the electronic original of the foregoing "Brief of Petitioner" was filed with the Clerk of the Court for the United States Court of Appeals for the D.C. Circuit on this 30th day of April, 2016 through the CM/ECF electronic filing system, and thus also served on counsel of record.

**/s/ J. Ramsay**

***James Bradford Ramsay***
**GENERAL COUNSEL**
**NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS**
**1101 VERMONT AVE., N.W., SUITE 200**
**WASHINGTON, D.C. 20005**
**TEL: (202) 898-2207**
**FAX: (202) 384-1554**
**E-MAIL: JRAMSAY@NARUC.ORG**

**Dated: January 30, 2017**

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 16-1170 (consolidated with No. 16-1219)

NATIONAL ASSOCIATION OF REGULATORY UTILITY COMMISSIONERS,

*Petitioner*,

v.

FEDERAL COMMUNICATIONS COMMISSION
and THE UNITED STATES OF AMERICA,

*Respondents*.

On Petitions for Review of an Order
of the Federal Communications Commission

# PETITIONER STATUTORY ADDENDUM

## Contents

5 U.S.C. §706. Scope of review ...... SA2
28 U.S.C. §2343. Venue ...... SA2
28 U.S.C. §2344. Review of orders ...... SA2
47 U.S.C. §151. Purposes of chapter ...... SA3
47 U.S.C. §152. Application of chapter ...... SA3
NOTES 47 U.S.C. §152. §601 ...... SA4
47 U.S.C. §153. Definitions ...... SA4
(1) Advanced communications services ...... SA4
(11) Common carrier ...... SA4
(20) Exchange access ...... SA5
(24) Information service ...... SA5
(25) Interconnected VoIP service ...... SA5
(28) Interstate communication ...... SA5
(32) Local exchange carrier ...... SA5
(33) Mobile service ...... SA5
(36) Non-interconnected VoIP service ...... SA6
(37) Number portability ...... SA6
(50) Telecommunications ...... SA6
(51) Telecommunications carrier ...... SA7
(53) Telecommunications service ...... SA7
(54) Telephone exchange service ...... SA7
(55) Telephone toll service ...... SA7
(59) Wire communication ...... SA7
47 U.S.C. §160 Competition ...... SA7
47 U.S.C. §214 Provision of universal service ...... SA8
47 U.S.C. §253 Removal of barriers to entry ...... SA11
47 U.S.C. §254 Universal service ...... SA11
47 U.S.C. §261 Effect on other requirements ...... SA14
47 U.S.C. §332 Regulatory treatment of mobile services ...... SA15
47 U.S.C. §1302 Advanced telecommunications ...... SA 19

## TITLE 5 SUBCHAPTER I—THE AGENCIES GENERALLY

**§706. Scope of review -** To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

## Title 28 SUBCHAPTER VI-PARTICULAR PROCEEDINGS

1. §2343. Venue - The venue of a proceeding under this chapter is in the judicial circuit in which the petitioner resides or has its principal office, or in the United States Court of Appeals for the District of Columbia Circuit.

2. §2344. Review of orders; time; notice; contents of petition; service - On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States. The petition shall contain a concise statement of— (1) the nature of the proceedings as to which review is sought; (2) the facts on which venue is based; (3) the grounds on which relief is sought; and (4) the relief prayed. The petitioner shall attach to the petition, as exhibits, copies of the order, report, or decision of the agency. The clerk shall serve a true copy of the petition on the

agency and on the Attorney General by registered mail, with request for a return receipt.

## TITLE 47 SUBCHAPTER I—GENERAL PROVISIONS

***47 U.S.C. §151. Purposes of chapter; Federal Communications Commission created -*** For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all the people of the United States, without discrimination on the basis of race, color, religion, national origin, or sex, a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communication, there is created a commission to be known as the "Federal Communications Commission", which shall be constituted as hereinafter provided, and which shall execute and enforce the provisions of this chapter.

---

***47 U.S.C. §152. Application of chapter –***

(a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio, which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone. The provisions of this chapter shall apply with respect to cable service, to all persons engaged within the United States in providing such service, and to the facilities of cable operators which relate to such service, as provided in subchapter V–A.

(b) Except as provided in sections 223 through 227 of this title, inclusive, and section 332 of this title, and subject to the provisions of section 301 of this title and subchapter V–A of this chapter, nothing in this chapter shall be construed to apply or to give the Commission jurisdiction with respect to (1) charges, classifications, practices, services, facilities, or regulations for or in connection with intrastate communication service by wire or radio of any carrier, or (2) any

carrier engaged in interstate or foreign communication solely through physical connection with the facilities of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (3) any carrier engaged in interstate or foreign communication solely through connection by radio, or by wire and radio, with facilities, located in an adjoining State or in Canada or Mexico (where they adjoin the State in which the carrier is doing business), of another carrier not directly or indirectly controlling or controlled by, or under direct or indirect common control with such carrier, or (4) any carrier to which clause (2) or clause (3) of this subsection would be applicable except for furnishing interstate mobile radio communication service or radio communication service to mobile stations on land vehicles in Canada or Mexico; except that sections 201 to 205 of this title shall, except as otherwise provided therein, apply to carriers described in clauses (2), (3), and (4) of this subsection.

---

**NOTES 47 U.S.C. §152. Applicability of Consent Decrees and Other Law**

Pub. L. 104–104, title VI, §601, Feb. 8, 1996, 110 Stat. 143, provided that:

"(c) Federal, State, and Local Law.—"(1) No implied effect.—This Act and the amendments made by this Act shall not be construed to modify, impair, or supersede Federal, State, or local law unless expressly so provided in such Act or amendments.

---

***47 U.S.C. §153. Definitions***

For the purposes of this chapter, unless the context otherwise requires—

**(1) Advanced communications services --** The term "advanced communications services" means— (A) interconnected VoIP service; (B) non-interconnected VoIP service; (C) electronic messaging service; and (D) interoperable video conferencing service.

*

**(11) Common carrier -** The term "common carrier" or "carrier" means any person engaged as a common carrier for hire, in interstate or foreign communication by wire or radio or interstate or foreign radio transmission of energy, except where reference is made to common carriers not subject to this chapter; but a person engaged in radio broadcasting shall not, insofar as such person is so engaged, be deemed a common carrier.

**(12) Connecting carrier -** The term "connecting carrier" means a carrier described in clauses (2), (3), or (4) of section 152(b) of this title.

*

**(20) Exchange access -** The term "exchange access" means the offering of access to telephone exchange services or facilities for the purpose of the origination or termination of telephone toll services.

*

**(24) Information service -** The term "information service" means the offering of a capability for generating, acquiring, storing, transforming, processing, retrieving, utilizing, or making available information via telecommunications, and includes electronic publishing, but does not include any use of any such capability for the management, control, or operation of a telecommunications system or the management of a telecommunications service.

**(25) Interconnected VoIP service -** The term "interconnected VoIP service" has the meaning given such term under section 9.3 of title 47, Code of Federal Regulations, as such section may be amended from time to time.

*

**(28) Interstate communication -** The term "interstate communication" or "interstate transmission" means communication or transmission (A) from any State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, to any other State, Territory, or possession of the United States (other than the Canal Zone), or the District of Columbia, (B) from or to the United States to or from the Canal Zone, insofar as such communication or transmission takes place within the United States, or (C) between points within the United States but through a foreign country; but shall not, with respect to the provisions of subchapter II of this chapter (other than section 223 of this title), include wire or radio communication between points in the same State, Territory, or possession of the United States, or the District of Columbia, through any place outside thereof, if such communication is regulated by a State commission.

*

**(32) Local exchange carrier -** The term "local exchange carrier" means any person that is engaged in the provision of telephone exchange service or exchange access. Such term does not include a person insofar as such person is engaged in the provision of a commercial mobile service under section 332(c) of this title, except to the extent that the Commission finds that such service should be included in the definition of such term.

**(33) Mobile service -** The term "mobile service" means a radio communication service carried on between mobile stations or receivers and land stations, and by mobile stations communicating among themselves, and includes (A) both one-way and two-way radio communication services, (B) a mobile service which provides a regularly interacting group of base, mobile, portable, and associated control and relay stations (whether licensed on an individual, cooperative, or multiple basis) for private one-way or two-way land mobile radio

communications by eligible users over designated areas of operation, and (C) any service for which a license is required in a personal communications service established pursuant to the proceeding entitled “Amendment to the Commission's Rules to Establish New Personal Communications Services” (GEN Docket No. 90–314; ET Docket No. 92–100), or any successor proceeding.

*

**(36) Non-interconnected VoIP service -** The term “non-interconnected VoIP service”— (A) means a service that— (i) enables real-time voice communications that originate from or terminate to the user's location using Internet protocol or any successor protocol; and (ii) requires Internet protocol compatible customer premises equipment; and (B) does not include any service that is an interconnected VoIP service.

**(37) Number portability -** The term “number portability” means the ability of users of telecommunications services to retain, at the same location, existing telecommunications numbers without impairment of quality, reliability, or convenience when switching from one telecommunications carrier to another.

*

**(44) Rural telephone company --** The term “rural telephone company” means a local exchange carrier operating entity to the extent that such entity— (A) provides common carrier service to any local exchange carrier study area that does not include either— (i) any incorporated place of 10,000 inhabitants or more, or any part thereof, based on the most recently available population statistics of the Bureau of the Census; or (ii) any territory, incorporated or unincorporated, included in an urbanized area, as defined by the Bureau of the Census as of August 10, 1993; (B) provides telephone exchange service, including exchange access, to fewer than 50,000 access lines; (C) provides telephone exchange service to any local exchange carrier study area with fewer than 100,000 access lines; or (D) has less than 15 percent of its access lines in communities of more than 50,000 on February 8, 1996.

*

**(48) State commission -** The term “State commission” means the commission, board, or official (by whatever name designated) which under the laws of any State has regulatory jurisdiction with respect to intrastate operations of carriers.

*

**(50) Telecommunications -** The term “telecommunications” means the transmission, between or among points specified by the user, of information of the user's choosing, without change in the form or content of the information as sent and received.

**(51) Telecommunications carrier -** The term “telecommunications carrier” means any provider of telecommunications services, except that such term does not include aggregators of telecommunications services (as defined in section 226 of this title). A telecommunications carrier shall be treated as a common carrier under this chapter only to the extent that it is engaged in providing telecommunications services, except that the Commission shall determine whether the provision of fixed and mobile satellite service shall be treated as common carriage.

*

**(53) Telecommunications service --** The term “telecommunications service” means the offering of telecommunications for a fee directly to the public, or to such classes of users as to be effectively available directly to the public, regardless of the facilities used.

**(54) Telephone exchange service --** The term “telephone exchange service” means (A) service within a telephone exchange, or within a connected system of telephone exchanges within the same exchange area operated to furnish to subscribers intercommunicating service of the character ordinarily furnished by a single exchange, and which is covered by the exchange service charge, or (B) comparable service provided through a system of switches, transmission equipment, or other facilities (or combination thereof) by which a subscriber can originate and terminate a telecommunications service.

**(55) Telephone toll service --** The term “telephone toll service” means telephone service between stations in different exchange areas for which there is made a separate charge not included in contracts with subscribers for exchange service.

**(59) Wire communication --** The term “wire communication” or “communication by wire” means the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

---

***47 U.S.C. §160. Competition in provision of telecommunications service***

**(a) Regulatory flexibility --** Notwithstanding section 332(c)(1)(A) of this title, the Commission shall forbear from applying any regulation or any provision of this chapter to a telecommunications carrier or telecommunications service, or class of telecommunications carriers or telecommunications services, in any or some of its or their geographic markets, if the Commission determines that—

(1) enforcement of such regulation or provision is not necessary to ensure that the charges, practices, classifications, or regulations by, for, or in

connection with that telecommunications carrier or telecommunications service are just and reasonable and are not unjustly or unreasonably discriminatory;

(2) enforcement of such regulation or provision is not necessary for the protection of consumers; and

(3) forbearance from applying such provision or regulation is consistent with the public interest.

**(b) Competitive effect to be weighed -** In making the determination under subsection (a)(3) of this section, the Commission shall consider whether forbearance from enforcing the provision or regulation will promote competitive market conditions, including the extent to which such forbearance will enhance competition among providers of telecommunications services. If the Commission determines that such forbearance will promote competition among providers of telecommunications services, that determination may be the basis for a Commission finding that forbearance is in the public interest.

**(c) Petition for forbearance -** Any telecommunications carrier, or class of telecommunications carriers, may submit a petition to the Commission requesting that the Commission exercise the authority granted under this section with respect to that carrier or those carriers, or any service offered by that carrier or carriers. Any such petition shall be deemed granted if the Commission does not deny the petition for failure to meet the requirements for forbearance under subsection (a) of this section within one year after the Commission receives it, unless the one-year period is extended by the Commission. The Commission may extend the initial one-year period by an additional 90 days if the Commission finds that an extension is necessary to meet the requirements of subsection (a) of this section. The Commission may grant or deny a petition in whole or in part and shall explain its decision in writing.

**(d) Limitation -** Except as provided in section 251(f) of this title, the Commission may not forbear from applying the requirements of section 251(c) or 271 of this title under subsection (a) of this section until it determines that those requirements have been fully implemented.

**(e) State enforcement after Commission forbearance -** A State commission may not continue to apply or enforce any provision of this chapter that the Commission has determined to forbear from applying under subsection (a) of this section.

---

## SUBCHAPTER II—COMMON CARRIERS

***<u>47 U.S.C. §214.</u>***

(e) Provision of universal service

(1) Eligible telecommunications carriers - A common carrier designated as an eligible telecommunications carrier under paragraph (2), (3), or (6) shall be eligible to receive universal service support in accordance with section 254 of this title and shall, throughout the service area for which the designation is received—

(A) offer the services that are supported by Federal universal service support mechanisms under section 254(c) of this title, either using its own facilities or a combination of its own facilities and resale of another carrier's services (including the services offered by another eligible telecommunications carrier); and

(B) advertise the availability of such services and the charges therefor using media of general distribution.

(2) Designation of eligible telecommunications carriers -- A State commission shall upon its own motion or upon request designate a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the State commission. Upon request and consistent with the public interest, convenience, and necessity, the State commission may, in the case of an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated by the State commission, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the State commission shall find that the designation is in the public interest.

(3) Designation of eligible telecommunications carriers for unserved areas - If no common carrier will provide the services that are supported by Federal universal service support mechanisms under section 254(c) of this title to an unserved community or any portion thereof that requests such service, the Commission, with respect to interstate services or an area served by a common carrier to which paragraph (6) applies, or a State commission, with respect to intrastate services, shall determine which common carrier or carriers are best able to provide such service to the requesting unserved community or portion thereof and shall order such carrier or carriers to provide such service for that unserved community or portion thereof. Any carrier or carriers ordered to provide such service under this paragraph shall meet the requirements of paragraph (1) and shall be designated as an eligible telecommunications carrier for that community or portion thereof.

(4) Relinquishment of universal service - A State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall permit an eligible telecommunications carrier to relinquish its designation as such a carrier in any area served by more than one eligible telecommunications carrier. An eligible telecommunications carrier that seeks to relinquish its eligible

telecommunications carrier designation for an area served by more than one eligible telecommunications carrier shall give advance notice to the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) of such relinquishment. Prior to permitting a telecommunications carrier designated as an eligible telecommunications carrier to cease providing universal service in an area served by more than one eligible telecommunications carrier, the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall require the remaining eligible telecommunications carrier or carriers to ensure that all customers served by the relinquishing carrier will continue to be served, and shall require sufficient notice to permit the purchase or construction of adequate facilities by any remaining eligible telecommunications carrier. The State commission (or the Commission in the case of a common carrier designated under paragraph (6)) shall establish a time, not to exceed one year after the State commission (or the Commission in the case of a common carrier designated under paragraph (6)) approves such relinquishment under this paragraph, within which such purchase or construction shall be completed.

(5) "Service area" defined - The term "service area" means a geographic area established by a State commission (or the Commission under paragraph (6)) for the purpose of determining universal service obligations and support mechanisms. In the case of an area served by a rural telephone company, "service area" means such company's "study area" unless and until the Commission and the States, after taking into account recommendations of a Federal-State Joint Board instituted under section 410(c) of this title, establish a different definition of service area for such company.

(6) Common carriers not subject to State commission jurisdiction - In the case of a common carrier providing telephone exchange service and exchange access that is not subject to the jurisdiction of a State commission, the Commission shall upon request designate such a common carrier that meets the requirements of paragraph (1) as an eligible telecommunications carrier for a service area designated by the Commission consistent with applicable Federal and State law. Upon request and consistent with the public interest, convenience and necessity, the Commission may, with respect to an area served by a rural telephone company, and shall, in the case of all other areas, designate more than one common carrier as an eligible telecommunications carrier for a service area designated under this paragraph, so long as each additional requesting carrier meets the requirements of paragraph (1). Before designating an additional eligible telecommunications carrier for an area served by a rural telephone company, the Commission shall find that the designation is in the public interest.

***47 U.S.C. §253. Removal of barriers to entry***

**(a) In general** No State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service.

**(b) State regulatory authority** Nothing in this section shall affect the ability of a State to impose, on a competitively neutral basis and consistent with section 254 of this title, requirements necessary to preserve and advance universal service, protect the public safety and welfare, ensure the continued quality of telecommunications services, and safeguard the rights of consumers.

**(c) State and local government authority** Nothing in this section affects the authority of a State or local government to manage the public rights-of-way or to require fair and reasonable compensation from telecommunications providers, on a competitively neutral and nondiscriminatory basis, for use of public rights-of-way on a nondiscriminatory basis, if the compensation required is publicly disclosed by such government.

**(d) Preemption** If, after notice and an opportunity for public comment, the Commission determines that a State or local government has permitted or imposed any statute, regulation, or legal requirement that violates subsection (a) or (b) of this section, the Commission shall preempt the enforcement of such statute, regulation, or legal requirement to the extent necessary to correct such violation or inconsistency.

**(e) Commercial mobile service providers** Nothing in this section shall affect the application of section 332(c)(3) of this title to commercial mobile service providers.

**(f) Rural markets** It shall not be a violation of this section for a State to require a telecommunications carrier that seeks to provide telephone exchange service or exchange access in a service area served by a rural telephone company to meet the requirements in section 214(e)(1) of this title for designation as an eligible telecommunications carrier for that area before being permitted to provide such service. This subsection shall not apply—

(1) to a service area served by a rural telephone company that has obtained an exemption, suspension, or modification of section 251(c)(4) of this title that effectively prevents a competitor from meeting the requirements of section 214(e)(1) of this title; and

(2) to a provider of commercial mobile services.

---

***47 U.S.C. §254. Universal service***

**(a) Procedures to review universal service requirements**

**(1) Federal-State Joint Board on universal service** Within one month after February 8, 1996, the Commission shall institute and refer to a Federal-State Joint Board under section 410(c) of this title a proceeding to recommend changes to any of its regulations in order to implement sections 214(e) of this title and this section, including the definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for completion of such recommendations. In addition to the members of the Joint Board required under section 410(c) of this title, one member of such Joint Board shall be a State-appointed utility consumer advocate nominated by a national organization of State utility consumer advocates. The Joint Board shall, after notice and opportunity for public comment, make its recommendations to the Commission 9 months after February 8, 1996.

**(2) Commission action** The Commission shall initiate a single proceeding to implement the recommendations from the Joint Board required by paragraph (1) and shall complete such proceeding within 15 months after February 8, 1996. The rules established by such proceeding shall include a definition of the services that are supported by Federal universal service support mechanisms and a specific timetable for implementation. Thereafter, the Commission shall complete any proceeding to implement subsequent recommendations from any Joint Board on universal service within one year after receiving such recommendations.

**(b) Universal service principles** The Joint Board and the Commission shall base policies for the preservation and advancement of universal service on the following principles:

**(1) Quality and rates** Quality services should be available at just, reasonable, and affordable rates.

**(2) Access to advanced services** Access to advanced telecommunications and information services should be provided in all regions of the Nation.

**(3) Access in rural and high cost areas** Consumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services, including interexchange services and advanced telecommunications and information services, that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas.

**(4) Equitable and nondiscriminatory contributions** All providers of telecommunications services should make an equitable and nondiscriminatory contribution to the preservation and advancement of universal service.

**(5) Specific and predictable support mechanisms** There should be specific, predictable and sufficient Federal and State mechanisms to preserve and advance universal service.

**(6) Access to advanced telecommunications services for schools, health care, and libraries** Elementary and secondary schools and classrooms, health care providers, and libraries should have access to advanced telecommunications services as described in subsection (h) of this section.

**(7) Additional principles** Such other principles as the Joint Board and the Commission determine are necessary and appropriate for the protection of the public interest, convenience, and necessity and are consistent with this chapter.

**(c) Definition**

**(1) In general** Universal service is an evolving level of telecommunications services that the Commission shall establish periodically under this section, taking into account advances in telecommunications and information technologies and services. The Joint Board in recommending, and the Commission in establishing, the definition of the services that are supported by Federal universal service support mechanisms shall consider the extent to which such telecommunications services—

(A) are essential to education, public health, or public safety;

(B) have, through the operation of market choices by customers, been subscribed to by a substantial majority of residential customers;

(C) are being deployed in public telecommunications networks by telecommunications carriers; and

(D) are consistent with the public interest, convenience, and necessity.

**(2) Alterations and modifications** The Joint oard may, from time to time, recommend to the Commission modifications in the definition of the services that are supported by Federal universal service support mechanisms.

**(3) Special services** In addition to the services included in the definition of universal service under paragraph (1), the Commission may designate additional services for such support mechanisms for schools, libraries, and health care providers for the purposes of subsection (h) of this section.

**(d) Telecommunications carrier contribution** Every telecommunications carrier that provides interstate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, to the specific, predictable, and sufficient mechanisms established by the Commission to preserve and advance universal service. The Commission may exempt a carrier or class of carriers from this requirement if the carrier's telecommunications activities are limited to such an extent that the level of such carrier's contribution to the preservation and advancement of universal service would be de minimis. Any other provider of

interstate telecommunications may be required to contribute to the preservation and advancement of universal service if the public interest so requires.

**(e) Universal service support** After the date on which Commission regulations implementing this section take effect, only an eligible telecommunications carrier designated under section 214(e) of this title shall be eligible to receive specific Federal universal service support. A carrier that receives such support shall use that support only for the provision, maintenance, and upgrading of facilities and services for which the support is intended. Any such support should be explicit and sufficient to achieve the purposes of this section.

**(f) State authority** A State may adopt regulations not inconsistent with the Commission's rules to preserve and advance universal service. Every telecommunications carrier that provides intrastate telecommunications services shall contribute, on an equitable and nondiscriminatory basis, in a manner determined by the State to the preservation and advancement of universal service in that State. A State may adopt regulations to provide for additional definitions and standards to preserve and advance universal service within that State only to the extent that such regulations adopt additional specific, predictable, and sufficient mechanisms to support such definitions or standards that do not rely on or burden Federal universal service support mechanisms.

**(g) Interexchange and interstate services** Within 6 months after February 8, 1996, the Commission shall adopt rules to require that the rates charged by providers of interexchange telecommunications services to subscribers in rural and high cost areas shall be no higher than the rates charged by each such provider to its subscribers in urban areas. Such rules shall also require that a provider of interstate interexchange telecommunications services shall provide such services to its subscribers in each State at rates no higher than the rates charged to its subscribers in any other State.

**(h) Telecommunications services for certain providers**

**(1) In general**

*****

**(2) Advanced services** The Commission shall establish competitively neutral rules— (A) to enhance, to the extent technically feasible and economically reasonable, access to advanced telecommunications and information services for all public and nonprofit elementary and secondary school classrooms, health care providers, and libraries; and (B) to define the circumstances under which a telecommunications carrier may be required to connect its network to such public institutional telecommunications users.

---

***<u>47 U.S.C. §261. Effect on other requirements</u>***

**(a) Commission regulations -** Nothing in this part shall be construed to prohibit the Commission from enforcing regulations prescribed prior to February 8, 1996, in fulfilling the requirements of this part, to the extent that such regulations are not inconsistent with the provisions of this part.

**(b) Existing State regulations -** Nothing in this part shall be construed to prohibit any State commission from enforcing regulations prescribed prior to February 8, 1996, or from prescribing regulations after February 8, 1996, in fulfilling the requirements of this part, if such regulations are not inconsistent with the provisions of this part.

**(c) Additional State requirements -** Nothing in this part precludes a State from imposing requirements on a telecommunications carrier for intrastate services that are necessary to further competition in the provision of telephone exchange service or exchange access, as long as the State's requirements are not inconsistent with this part or the Commission's regulations to implement this part.

---

SUBCHAPTER III—SPECIAL PROVISIONS RELATING TO RADIO

***47 U.S.C. §332. Mobile services***

*****

**(c) Regulatory treatment of mobile services**

**(1) Common carrier treatment of commercial mobile services**

(A) A person engaged in the provision of a service that is a commercial mobile service shall, insofar as such person is so engaged, be treated as a common carrier for purposes of this chapter, except for such provisions of subchapter II of this chapter as the Commission may specify by regulation as inapplicable to that service or person. In prescribing or amending any such regulation, the Commission may not specify any provision of section 201, 202, or 208 of this title, and may specify any other provision only if the Commission determines that—

(i) enforcement of such provision is not necessary in order to ensure that the charges, practices, classifications, or regulations for or in connection with that service are just and reasonable and are not unjustly or unreasonably discriminatory;

(ii) enforcement of such provision is not necessary for the protection of consumers; and

(iii) specifying such provision is consistent with the public interest.

(B) Upon reasonable request of any person providing commercial mobile service, the Commission shall order a common carrier to establish physical connections with such service pursuant to the provisions of section 201 of this title. Except to the extent that the Commission is required to respond to such a request,

this subparagraph shall not be construed as a limitation or expansion of the Commission's authority to order interconnection pursuant to this chapter.

(C) The Commission shall review competitive market conditions with respect to commercial mobile services and shall include in its annual report an analysis of those conditions. Such analysis shall include an identification of the number of competitors in various commercial mobile services, an analysis of whether or not there is effective competition, an analysis of whether any of such competitors have a dominant share of the market for such services, and a statement of whether additional providers or classes of providers in those services would be likely to enhance competition. As a part of making a determination with respect to the public interest under subparagraph (A)(iii), the Commission shall consider whether the proposed regulation (or amendment thereof) will promote competitive market conditions, including the extent to which such regulation (or amendment) will enhance competition among providers of commercial mobile services. If the Commission determines that such regulation (or amendment) will promote competition among providers of commercial mobile services, such determination may be the basis for a Commission finding that such regulation (or amendment) is in the public interest.

(D) The Commission shall, not later than 180 days after August 10, 1993, complete a rulemaking required to implement this paragraph with respect to the licensing of personal communications services, including making any determinations required by subparagraph (C).

**(2) Non-common carrier treatment of private mobile services -** A person engaged in the provision of a service that is a private mobile service shall not, insofar as such person is so engaged, be treated as a common carrier for any purpose under this chapter. A common carrier (other than a person that was treated as a provider of a private land mobile service prior to August 10, 1993) shall not provide any dispatch service on any frequency allocated for common carrier service, except to the extent such dispatch service is provided on stations licensed in the domestic public land mobile radio service before January 1, 1982. The Commission may by regulation terminate, in whole or in part, the prohibition contained in the preceding sentence if the Commission determines that such termination will serve the public interest.

**(3) State preemption –**

(A) Notwithstanding sections 152(b) and 221(b) of this title, no State or local government shall have any authority to regulate the entry of or the rates charged by any commercial mobile service or any private mobile service, except that this paragraph shall not prohibit a State from regulating the other terms and conditions of commercial mobile services. Nothing in this subparagraph shall exempt providers of commercial mobile services (where such services are a

substitute for land line telephone exchange service for a substantial portion of the communications within such State) from requirements imposed by a State commission on all providers of telecommunications services necessary to ensure the universal availability of telecommunications service at affordable rates. Notwithstanding the first sentence of this subparagraph, a State may petition the Commission for authority to regulate the rates for any commercial mobile service and the Commission shall grant such petition if such State demonstrates that—

(i) market conditions with respect to such services fail to protect subscribers adequately from unjust and unreasonable rates or rates that are unjustly or unreasonably discriminatory; or

(ii) such market conditions exist and such service is a replacement for land line telephone exchange service for a substantial portion of the telephone land line exchange service within such State.

The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition. If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such periods of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory.

(B) If a State has in effect on June 1, 1993, any regulation concerning the rates for any commercial mobile service offered in such State on such date, such State may, no later than 1 year after August 10, 1993, petition the Commission requesting that the State be authorized to continue exercising authority over such rates. If a State files such a petition, the State's existing regulation shall, notwithstanding subparagraph (A), remain in effect until the Commission completes all action (including any reconsideration) on such petition. The Commission shall review such petition in accordance with the procedures established in such subparagraph, shall complete all action (including any reconsideration) within 12 months after such petition is filed, and shall grant such petition if the State satisfies the showing required under subparagraph (A)(i) or (A)(ii). If the Commission grants such petition, the Commission shall authorize the State to exercise under State law such authority over rates, for such period of time, as the Commission deems necessary to ensure that such rates are just and reasonable and not unjustly or unreasonably discriminatory. After a reasonable period of time, as determined by the Commission, has elapsed from the issuance of an order under subparagraph (A) or this subparagraph, any interested party may petition the Commission for an order that the exercise of authority by a State pursuant to such subparagraph is no longer necessary to ensure that the rates for commercial mobile services are just and reasonable and not unjustly or

unreasonably discriminatory. The Commission shall provide reasonable opportunity for public comment in response to such petition, and shall, within 9 months after the date of its submission, grant or deny such petition in whole or in part.

*

**(C) Definitions**

For purposes of this paragraph—

(i) the term "personal wireless services" means commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;

(ii) the term "personal wireless service facilities" means facilities for the provision of personal wireless services; and

(iii) the term "unlicensed wireless service" means the offering of telecommunications services using duly authorized devices which do not require individual licenses, but does not mean the provision of direct-to-home satellite services (as defined in section 303(v) of this title).

**(8) Mobile services access --** A person engaged in the provision of commercial mobile services, insofar as such person is so engaged, shall not be required to provide equal access to common carriers for the provision of telephone toll services. If the Commission determines that subscribers to such services are denied access to the provider of telephone toll services of the subscribers' choice, and that such denial is contrary to the public interest, convenience, and necessity, then the Commission shall prescribe regulations to afford subscribers unblocked access to the provider of telephone toll services of the subscribers' choice through the use of a carrier identification code assigned to such provider or other mechanism. The requirements for unblocking shall not apply to mobile satellite services unless the Commission finds it to be in the public interest to apply such requirements to such services.

**(d) Definitions** For purposes of this section—

(1) the term "commercial mobile service" means any mobile service (as defined in section 153 of this title) that is provided for profit and makes interconnected service available (A) to the public or (B) to such classes of eligible users as to be effectively available to a substantial portion of the public, as specified by regulation by the Commission;

(2) the term "interconnected service" means service that is interconnected with the public switched network (as such terms are defined by regulation by the Commission) or service for which a request for interconnection is pending pursuant to subsection (c)(1)(B) of this section; and

(3) the term "private mobile service" means any mobile service (as defined in section 153 of this title) that is not a commercial mobile service or the

functional equivalent of a commercial mobile service, as specified by regulation by the Commission.

---

## CHAPTER 12—BROADBAND

***47 U.S.C. §1302. Advanced telecommunications incentives***

(a) In general - The Commission and each State commission with regulatory jurisdiction over telecommunications services shall encourage the deployment on a reasonable and timely basis of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) by utilizing, in a manner consistent with the public interest, convenience, and necessity, price cap regulation, regulatory forbearance, measures that promote competition in the local telecommunications market, or other regulating methods that remove barriers to infrastructure investment.

(b) Inquiry - The Commission shall, within 30 months after February 8, 1996, and annually thereafter, initiate a notice of inquiry concerning the availability of advanced telecommunications capability to all Americans (including, in particular, elementary and secondary schools and classrooms) and shall complete the inquiry within 180 days after its initiation. In the inquiry, the Commission shall determine whether advanced telecommunications capability is being deployed to all Americans in a reasonable and timely fashion. If the Commission's determination is negative, it shall take immediate action to accelerate deployment of such capability by removing barriers to infrastructure investment and by promoting competition in the telecommunications market.

(c) Demographic information for unserved areas - As part of the inquiry required by subsection (b), the Commission shall compile a list of geographical areas that are not served by any provider of advanced telecommunications capability (as defined by subsection (d)(1)) [1] and to the extent that data from the Census Bureau is available, determine, for each such unserved area— (1) the population; (2) the population density; and (3) the average per capita income.

(d) Definitions For purposes of this subsection:

(1) Advanced telecommunications capability - The term “advanced telecommunications capability” is defined, without regard to any transmission media or technology, as high-speed, switched, broadband telecommunications capability that enables users to originate and receive high-quality voice, data, graphics, and video telecommunications using any technology.

(2) Elementary and secondary schools -- The term “elementary and secondary schools” means elementary and secondary schools, as defined in section 7801 of title 20.